[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 934 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 935 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 936 
 On Application for Rehearing
The opinion of January 13, 2006, is withdrawn the following opinion is substituted therefor.
John Wesley Boyce, Sr.; his wife, Mayron B. Boyce; and John Wesley Boyce, Sr., as trustee under the Revocable Trust of John Wesley Boyce, Sr. (hereinafter referred to collectively as "the Boyces"), appeal from a summary judgment entered in favor of Joseph Cassese; his wife, Jenna Knox Cassese; Greystone Golf Club, Inc.; Birmingham Title Services Corporation and Stewart Title Guaranty Company (hereinafter sometimes collectively referred to as "the title companies"). We affirm in part and reverse in part.
 Facts
In July 1993, the Casseses purchased a lot in the Greystone subdivision in Shelby County. The lot they purchased was located adjacent to the 18th hole of the Greystone Golf Club. The Casseses had a residence constructed for them on the lot. After the Casseses had taken possession of this property, the Golf Club began hosting the "Bruno's Golf Tournament." Because of the location of the Casseses' property, a portion of the tournament was conducted adjacent to their property.[1] At some point in 1993, the Casseses orally agreed that the Golf Club could use a portion of the Casseses' property during the Bruno's tournament.
In 1994, the Casseses and the Golf Club entered into a written license agreement. This license agreement provided, in pertinent part:
 "Grantors [the Casseses] desire to grant to Grantee [the Golf Club] a license on the terms and conditions hereinafter set forth to use a portion of the Lot lying directly adjacent to the Golf Club Property. *Page 937 
 ". . . .
 "1. Grant of License. Grantors do hereby grant, bargain, sell and convey to Grantee a [illegible] license to use a strip of land running along the rear property line of the Lot . . . (the `License Property'). The License Property shall be used only for the purposes specified in Paragraph 3 below, and, except as described in Paragraphs 2 and 3 below, no fences, landscaping, improvements or structures of any nature shall be erected, placed, installed or allowed to remain on the Easement License Property by either Grantors or Grantee.
 "2. Maintenance of License Property. Grantee does hereby covenant and agree to (a) at all times maintain the License Property in good condition and repair as part of the golf course situated on the Golf Club Property and (b) install and maintain out of bound markers in appropriate locations on the License Property.
 "3. Use of License Property.
 "(a) The License Property and any portion thereof may be used by Grantee, its members, employees, agents, contractors, invitees and licensees as part of the golf course situated on the Golf Club Property for the play of golf, including, specifically, (i) for entry thereon by golfers and their caddies to play or remove golf balls therefrom and (ii) to conduct any of the maintenance activities described in Paragraph 2 above.
 "(b) Subject to the provisions of Paragraph 6 below, the License Property may be used by Grantee, its members, employees, agents, contractors, invitees and licensees as a viewing area (whether for seating or standing) and for other uses in connection with and during any golf tournaments on the Golf Club Property including, without limitation, any golf tournaments sponsored or sanctioned by the Professional Golf Association, the United States Golf Association, the Senior Professional Golf Association or the Ladies Professional Golf Association (collectively, `Tournaments'). During any Tournaments Grantee covenants and agrees to install roping or screening on the License Property so as to restrict any public access to all remaining portions of the [illegible] lying outside the License Property."
(Strikeout in original.)
In addition to the above-quoted provisions, the Golf Club also agreed to perform regular maintenance on that portion of the Casseses' property to which the Golf Club was allowed access by the license agreement, to provide commercial general liability insurance covering that portion of the Casseses' property, and to remove certain trees that were blocking the sight line from the Casseses' property to the 18th hole of the golf course. The Golf Club also agreed to refrain from taking any action or making any improvements on the golf course that would impair the line of sight from the property to the 18th hole of the course. In addition, the license agreement provided in paragraph 6:
 "The covenants, license, rights and obligations granted or created pursuant to this Agreement shall be and are appurtenant to and shall be deemed to be covenants running with the land and shall be binding upon and inure to the benefit of Grantors and Grantee and their respective heirs, executors, successors and assigns, forever; provided; however, that the license and use rights set forth in Paragraph 3(b) above shall automatically cease and terminate and be of no further force and effect on the date which is three (3) years from the date hereof unless otherwise extended by mutual agreement of Grantors and Grantee. This Agreement constitutes *Page 938 
the entire Agreement between the parties hereto and may be amended and modified only by written instrument duly executed by the then owners of the Lot and the then owner of the Golf Club Property. The terms `Grantors' and `Grantee' as used herein shall include the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns."
Neither the Casseses nor the Golf Club recorded this agreement in 1994, 1995, or 1996.
In January 1996, the Casseses listed their property for sale with RE/MAX Realty. Later that year, on December 10, 1996, the Golf Club and the Casseses executed a "First Amendment to the License Agreement." That amendment provided:
 "Grantors and Grantee have heretofore entered into a License Agreement dated as of March 22, 1994 (the `Agreement') which has been recorded as Instrument No. ___ in the office of the Judge of Probate of Shelby County, Alabama. Capitalized terms not otherwise expressly defined herein shall have the same meanings given to them in the Agreement.
 "Grantors and Grantee desire to extend the term of the Agreement with respect to any Tournaments held on the Golf Club Property.
 ". . . .
 "1. Extension of Term. Notwithstanding anything provided in the Agreement to the contrary, Grantors and Grantee agree that the license and use rights set forth in Paragraph 3(b) of the Agreement shall continue in full force and effect for so long as any Tournaments are held on the Golf Club Property and any contrary provisions set forth in Paragraph 6 of the Agreement are hereby deleted.
 "2. Full Force and Effect. Except as expressly modified and amended herein, all of the terms and provisions of the Agreement shall remain in full force and effect."
(Blank in original later filled in by the parties.)
Less than a month after the amendment was executed, on January 5, 1997, the Boyces made an offer to purchase the Casseses' property; the Casseses accepted this offer. However, the sales contract did not reference the license agreement between the Casseses and the Golf Club, and that contract did not reference the fact that the Golf Club was permitted to use a portion of the Casseses' property. The Boyces claimed that they were not informed during the negotiations concerning the property of the existence of the license agreement and the amendment.
On January 8, 1997, Birmingham Title Services Corporation issued a title commitment in preparation for the closing on the property. According to Stewart Title Guaranty Company, Birmingham Title is a limited agent of Stewart, authorized to issue title policies in the name of Stewart Title. (Stewart Title Guaranty Company's brief, at p. 5.) This title commitment did not reveal the existence of the license agreement or the amendment.
On Friday, January 24, 1997, the Golf Club recorded in the Shelby County Probate Office the license agreement executed in 1994 and the amendment to the license agreement executed in 1996. The following Tuesday, January 28, 1997, the Boyces obtained title to the property from the Casseses by a warranty deed. This warranty deed did not disclose or reference the license agreement or the amendment to that agreement; neither did the deed disclose or reference the Golf Club's right *Page 939 
to access or to use a portion of the property for its golf tournaments.
In March 1997, a title insurance policy was issued in the name of Stewart Title Guaranty Company. That policy indicated an effective date of March 14, 1997, and named the Boyces as "insureds."
After taking possession of the property in mid-February 1997, the Boyces noticed that employees of the Golf Club were performing maintenance on the property. In March 1997, the Golf Club began setting up for the Bruno's Golf Tournament. Boyce testified that, in preparing for the golf tournament, employees of the Golf Club placed the following on or over his property: bleachers, signs, broadcast towel's, trailers, generators, televisions and telephone lines, and 30 to 40 portable toilets. Boyce testified that preparations for the tournament continued for approximately three months.
John Boyce, Sr., complained to the manager of the Golf Club about these activities occurring on his property, but no action was taken by either party. The Golf Club continued to access the Boyces' property in connection with its golf tournaments during the period of 1998-2002. Boyce claimed that he continued to complain without success about the Golf Club's use of his property.
The Boyces claimed that, in February 2003, they learned for the first time of the existence of a written license agreement between the Casseses and the Golf Club when he saw an employee of the Golf Club on his property holding a copy of a survey. The Boyces obtained a copy of the survey from the employee. The Boyces claimed that the survey, which apparently referenced the recorded license agreement, led to their discovery of the recorded license agreement a few weeks later.
In April 2002, the Boyces sued the Casseses, the Golf Club, and the title companies. The Boyces sought a judgment declaring that the license agreement and its amendment were void, and they requested a permanent injunction against the Golf Club enjoining the Golf Club from accessing or using their property; alternatively, they sought rescission of the purchase transaction against the Casseses. The Boyces also asserted that the agreements between the Casseses and the Golf Club created a license and that the Boyces had revoked that license. Against the Casseses, the Boyces alleged fraudulent misrepresentation, fraudulent suppression, breach of the warranty deed, and conspiracy; the Boyces also sought indemnification under the warranty deed against the Casseses; against the Golf Club, the Boyces claimed trespass, nuisance, negligence and wantonness, fraudulent suppression, and conspiracy; against the title companies, the Boyces alleged negligence, wantonness, suppression, and breach of the title policy.
All of the defendants filed motions for a summary judgment. On December 14, 2004, the trial court entered an order declaring that the agreements between the Casseses and the Golf Club created an easement, as opposed to a license. The trial court also granted the Golf Club's motion for a summary judgment on all claims, finding that "there is no evidence that [the Golf Club] was engaged in fraud, was negligent or conspired to commit any tort against [the Boyces] and such claims are also time barred." The trial court's order did not address the Boyces' claims of trespass and nuisance asserted against the Golf Club.
The trial court also granted the Casseses' motion for a summary judgment as to all of the claims asserted against them. The trial court entered a summary judgment *Page 940 
for the Casseses on the Boyces' breach-of-warranty-deed claim, relying on the merger doctrine and finding that the warranty deed issued to the Boyces by the Casseses did not contain any promises regarding the grant of the property right — be it license or easement — made the basis of this case. The trial court concluded that the only cause of action available to the Boyces for the Casseses' alleged failure to disclose the existence of the license agreement was for fraud. However, the trial court held that the Boyces' fraud claim against the Casseses was time-barred.
Subsequently, on February 28, 2005, and without stating its reasoning, the trial court entered summary judgments in favor of the title companies. In this same order, the trial court also clarified that it had entered a summary judgment in favor of the Casseses as to all claims asserted against them. On March 4, 2005, the trial court amended its earlier order, clarifying that it had disposed of all claims asserted against all of the defendants in this matter.
The Boyces appealed, asserting that the trial court erred by entering summary judgments in favor of the Casseses, the Golf Club, and the title companies. The Boyces also assert that the trial court erroneously concluded that the agreement between the Casseses and the Golf Club created an easement rather than a license.
 Standard of Review
"We review the trial court's entry of a summary judgment de novo, and our standard of review is well settled.
 "`In reviewing the disposition of a motion for summary judgment, "we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact," Bussey v. John Deere Co., 531 So.2d 860, 862
(Ala. 1988), and whether the movant was "entitled to a judgment as a matter of law." Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990).'
 "Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997)."
Hollingsworth v. City of Rainbow City, 826 So.2d 787,789 (Ala. 2001).
 Analysis
The parties disagree as to whether the agreement between the Casseses and the Golf Club created a license or an easement. The Boyces and the title companies contend that the agreement created a revocable license. The Golf Club argues that the agreement created an easement and that such easement ran with the land. The Casseses did not express an opinion on this issue but argue that they had no knowledge that the agreement would create *Page 941 
an encumbrance on the property or that the agreement would be recorded. (Casseses' brief, at p. 20.) The trial court concluded that the parties had created an easement. We review the general distinctions between easements and licenses to determine whether the agreement in this case created a license or an easement .
According to The Law of Easements and Licenses in Land:
 "§ 1:4 — Fundamental difference
 "A license is often defined as permission to do an act or a series of acts on another's land that, absent authorization, would constitute trespass. Because permission is the voluntary grant of a personal privilege, the landowner may usually revoke consent at any time and thereby terminate the license. Given their revocable nature, licenses generally are not considered to reach the status of interests in land. In contrast, easements are irrevocable interests in land of potentially perpetual duration.
 "Several distinctions flow from this fundamental difference. An express easement must be in writing to satisfy the Statute of Frauds; a license may be, and often is, given orally. Easement holders are entitled to protection from interference from third parties; licensees generally are not. Most easements are transferable; licenses are not transferable unless the parties intended otherwise.
 ". . . .
 "§ 1:5 Intent of parties
 "All of the legal distinctions between easements and licenses mentioned in the preceding section only hint at how one can decide which right was created. The critical factor is the parties' intent. The following elements are important in ascertaining intent:
 "1. Manner of creation of right (oral or written). The mere granting of a right in writing does not automatically render it an easement. . . . [M]ore is required to create an easement. The existence or absence of words that are `ordinarily used in the conveyances of real estate' is an important factor. The label that the parties give the right, however, does not dictate its legal effect. For example, a right called a lease may in reality be an easement or a license.
 "2. Nature of right created. The creation of a right to be used in a particular portion of the servient estate indicates that an easement was intended. Likewise, the existence of authority in the holder of the right to maintain or improve the burdened property suggests an easement.
 "3. Duration of right. A set duration indicates an easement. A grant in perpetuity also indicates an easement. Further, an express provision that the right benefits its holders' successors and assigns supports the conclusion that an easement was intended. Similarly, an easement is indicated if the right expressly binds the servient landowner's successors and assigns. Conversely, the deletion of words of succession may indicate a license. Finding an easement, however, does not depend upon the existence of `magic words such as "successors and assigns."'
 "4. Amount of consideration, if any, given for right. Substantial consideration indicates an easement. In this regard, it is necessary to distinguish consideration given for the right from money expended in reliance upon the right. An `irrevocable license' may result from expenditures made in reliance on an existing license.
 "5. Reservation of power to revoke right. An express reservation of the *Page 942 
power to cancel, revoke, or terminate the right may be considered to indicate a license. However, a power to terminate in the landowner does not necessarily mean that a license was created. Specifying a power to terminate for a particular reason or in limited circumstances may be seen as inconsistent with the unabridged right to revoke retained by one who grants a license. Moreover, an easement may be expressly subject to termination by the servient owner upon the occurrence of a specified event."
Jon W. Bruce James N. Ely, Jr., The Law of Easementsand Licenses in Land(West Group 2001) (footnotes omitted).
Applying these factors to the instant case, we agree with the trial court that the Casseses and the Golf Club intended to create an easement. The agreement as amended contains words typical of a conveyance of an interest in land; the Golf Club was granted the right to use a portion of the property for golf tournaments in exchange for the promise to maintain and improve that property and to provide liability insurance covering the property during the tournaments; the agreement indicated that the rights and obligations granted in it were to run with the land and that they were binding upon the parties' successors and assigns; and the Casseses, as the owner of the servient estate, did not reserve the right to cancel or terminate the Golf Club's rights under the agreement. All of these factors indicate an intent to create an easement rather than a license. SeeHelms v. Tullis, 398 So.2d 253 (Ala. 1981) (citing Powell, Powell on Real Property, §§ 407-413, recognizing that an easement may be created by contractual agreement). We affirm the summary judgment insofar as the trial court held that the agreement created an easement.
 Whether the trial court erred in entering a summary judgment in favor of the Casseses on all claims.
The Boyces also appeal from the summary judgment entered in favor of the Casseses on the Boyces' claims of fraudulent misrepresentation, fraudulent suppression, conspiracy, and breach of the warranty deed. We reverse the summary judgment on the breach-of-warranty-deed claim and the claim for indemnity. We affirm as to all other counts.
We first address the claims of fraudulent misrepresentation and suppression. The Boyces claimed that during the negotiations concerning the property, Mr. Cassese falsely represented that there were no encumbrances against the property of which the Boyces should be apprised. The Boyces also assert that Mr. Cassese failed to disclose the fact that he and his wife had just executed the amendment to the license agreement, which would encumber the property and bind the Boyces, if they purchased the property.
The trial court entered a summary judgment in favor of the Casseses on the fraud and suppression claims, holding (1) that upon the closing, all representations and negotiations between the parties merged into the deed and the deed became the sole memorial of any agreement made by the parties, and (2) that the Boyces' fraud and suppression claims were time-barred by §6-2-38, Ala. Code 1975 (providing a two-year statute of limitations applicable to fraud actions) and by § 6-2-3, Ala. Code 1975, because the Boyces' did not assert those claims within two years of discovering the facts allegedly constituting the fraud.
This Court has recognized that "[a]bsent fraud or mistake, when a contract to sell or convey land is consummated by execution and delivery of a deed, *Page 943 
that contract becomes `functus officio' and the deed becomes the sole memorial of the parties' agreement." Swanson v.Green, 572 So.2d 1246, 1248 (Ala. 1990) (footnotes omitted). We agree with this principle, known as the "merger doctrine." However, we need not apply it in this case because, as discussed below, the Boyces' misrepresentation and suppression claims are barred by the applicable statute of limitations and we therefore cannot reach the question whether there was fraud so as to negate the application of the merger doctrine.
The Boyces' claims of fraudulent misrepresentation and fraudulent suppression are subject to a two-year statute of limitations. Ala. Code 1975, § 6-2-38(l); Exparte Seabol, 782 So.2d 212, 216 (Ala. 2000). However,
 "[t]hat statute of limitations is subject to the `saving clause' provided by § 6-2-3:
 "`In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.'"
Seabol, 782 So.2d at 216. However, our analysis of this issue is also impacted by Ala. Code 1975, § 35-4-90(a), which provides:
 "All conveyances of real property, deeds, mortgages, deeds of trust or instruments in the nature of mortgages to secure any debts are inoperative and void as to purchasers for a valuable consideration, mortgagees and judgment creditors without notice, unless the same have been recorded before the accrual of the right of such purchasers, mortgagees or judgment creditors."
 We have also recognized:
 "Under Ala. Code 1975, § 35-4-90, the proper recordation of an instrument constitutes `conclusive notice to all the world of everything that appears from the face' of the instrument. Thus, purchasers of real estate are `presumed to have examined the title records and knowledge of the contents of those records is imputed [to them].'"
Haines v. Tonning, 579 So.2d 1308, 1310 (Ala. 1991) (quoting Christopher v. Shockley, 199 Ala. 681, 682, 75 So. 158, 158 (1917), and Walker v. Wilson,469 So.2d 580, 582 (Ala. 1985)).
It is undisputed that the Golf Club recorded the license agreement and the amendment to the license agreement on January 24, 1997, a few days before the Boyces acquired their interest in the property. Because the agreement was recorded at the time the Boyces obtained title to the property, they are charged with notice of the recorded agreement as of that time. This action was filed in April 2002, more than five years after the Boyces obtained title to the property and more than five years after the Boyces are charged with notice of the encumbrance against their property. For this reason, the Boyces' claims of fraudulent misrepresentation and fraudulent suppression against the Casseses are time-barred.
We next address the Boyces' claim that the Casseses conspired with the Golf Club "to omit material facts from the public and, specifically from the [Boyces], by wrongfully withholding and not promptly recording the License and License Amendment to place prospective purchasers, like the [Boyces], on notice of any encumbrance on the property by Greystone, following notice of the sale." We have concluded that the Boyces' claims of fraudulent misrepresentation and fraudulent suppression are time-barred. For the *Page 944 
same reasons, the Boyces' conspiracy claims against the Casseses are time-barred. See § 6-2-38, Ala. Code 1975 (two-year statute of limitations applicable to fraud and conspiracy actions); Kelly v. Alexander, 554 So.2d 343,344 (Ala. 1989) ("Because the conspiracy to defraud claim is dependent upon the underlying fraud, the statute of limitations on that claim began to run at the same time as did the statute for the underlying fraud claim."), overruled on othergrounds, Ford Motor Co. v. Neese, 572 So.2d 1255
(Ala. 1990). We affirm the summary judgment on the conspiracy claim against the Casseses.
We next address the Boyces' claims that the Casseses breached the warranty. Alabama Code 1975, § 35-4-271, provides:
 "In all conveyances of estates in fee, the words `grant,' `bargain,' `sell' or either of them, must be construed, unless it otherwise clearly appears from the conveyance, [as] an express covenant to the grantee, his heirs and assigns, that the grantor was seised of an indefeasible estate in fee simple, free from incumbrances done or suffered by the grantor, except the rents and services that are reserved; and also for quiet enjoyment against the grantor, his heirs and assigns, unless limited by the express words of such conveyance; and the grantee, his heirs, personal representatives, and assigns may, in any action, assign breaches, as if such covenants were expressly inserted."
The warranty deed by which the Casseses conveyed the property to the Boyces provided:
 "We do, for ourselves and for our heirs, executors and administrators, covenant with said grantee, their heirs and assigns, that we are lawfully seized in fee simple of said premises; that they are free from all encumbrances, unless otherwise stated above; that we have a good right to sell and convey the same as aforesaid; that we will, and our heirs, executors and administrators shall, warrant and defend the same to the said grantee, their heirs and assigns forever, against the lawful claims of all persons."
This deed was executed on January 28, 1997. It is undisputed0 that the warranty deed made no exception for or reference to the license agreement or to the amendment to the license agreement.
Thus, the Boyces presented substantial evidence indicating that, at the time the Casseses conveyed the property to them, the Casseses were not "lawfully seized in fee simple. . . . free from all encumbrances" and the Casseses did not disclose in the deed the encumbrance created by the license agreement and the amendment to the license agreement. This evidence raises a genuine issue of material fact regarding the Boyces' claim that the Casseses breached the warranty in their deed. We conclude that the trial court's summary judgment for the Casseses on this claim was improper.
 Claims Against the Golf Club
Against the Golf Club, the Boyces alleged trespass, nuisance, wantonness, fraudulent suppression, and conspiracy. We readily dispose of the Boyces' claim that the Golf Club fraudulently suppressed from them the existence of the license agreement "in an attempt to escape any effect the Licenses may have on the marketability of the Property." For the same reasons that the Boyces' claims of fraudulent misrepresentation and fraudulent suppression against the Casseses are time-barred, the Boyces' claim of suppression against the Golf Club is also time-barred. See § 6-2-38, Ala. Code 1975.
As of January 24, 1997, the date the Golf Club recorded the license agreement *Page 945 
and the amendment, the Boyces were charged with constructive knowledge of that agreement and the encumbrance against the property that that agreement created. On January 28, 1997, four days after the Golf Club recorded the license agreement and the amendment, the property was conveyed to the Boyces. Pursuant to Alabama statute, this recordation is deemed constructive notice to the world of the license agreement and the amendment. Thus, the Boyces cannot now complain that the Golf Club suppressed from them the existence of the license agreement when that agreement was publicly and properly recorded four days before the Boyces purchased the property. Because they did not file their fraud claim against the Golf Club within the two-year limitations period, `chat claim is now time-barred. We affirm the trial court's summary judgment as to the fraudulent-suppression claim against the Golf Club.
We also affirm the summary judgment entered on the Boyces' conspiracy claim against the Golf Club. The Boyces alleged that the Casseses and the Golf Club conspired to withhold material information from the public, and particularly from prospective purchasers of the Casseses' property. Because we have already concluded that the Boyces' conspiracy claim against the Casseses is time-barred, for the same reasons that same claim is time-barred against the Golf Club.
We next address the Boyces' claims of negligence and wantonness against the Golf Club. In their amended complaint, the Boyces alleged that the Golf Club negligently and wantonly failed to record the license agreement and the amendment until January 1997. Like fraud claims, negligence and wantonness claims are governed by a two-year statute of limitations. See § 6-2-38, Ala. Code 1975. The Boyces did not file their action until April 2002, although they are alleging that the Golf Club acted negligently or wantonly before January 1997. The Boyces' claims of negligence and wantonness are time-barred, and the trial court properly entered a summary judgment for the Golf Club on these claims.
We also affirm the summary judgment in favor of the Golf Club as to the Boyces' claims alleging trespass and nuisance. In their trespass claim, the Boyces allege that the Golf Club allowed persons attending golf tournaments and playing golf at the Golf Club to enter the Boyces' property improperly. The Boyces claim that this entry was without their permission and without any other right to enter.
This trespass claim fails as a matter of law. A trespass to property is a wrong against the right of possession or entry.Jefferies v. Bush, 608 So.2d 361, 362 (Ala. 1992);AmSouth Bank v. City of Mobile, 500 So.2d 1072
(Ala. 1986). If a party enters property or possesses property under a legal right, entry or possession pursuant to that right cannot constitute a trespass.
As stated above, the license agreement granted the Golf Club the legal right to use a portion of the Casseses' property in connection with golf tournaments held at the Golf Club and granted persons playing golf at the Golf Club the right to enter the property for certain specified purposes. Once this agreement was properly recorded, the Golf Club's rights under the agreement were preserved as against subsequent purchasers, including the Boyces. Because the Golf Club had authority to enter the property and the Boyces do not allege that the Golf Club exceeded that authority, the Boyces' claim of trespass fails as a matter of law.
The Boyces also asserted a nuisance claim, alleging that the Golf Club's *Page 946 
periodic use of their property caused the Boyces' use and enjoyment of the property to be diminished and caused them to suffer emotional distress and mental anguish. Alabama Code 1975, § 6-5-120, provides:
 "A `nuisance' is anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful or such as would affect only one of a fastidious taste, but it should be such as would affect an ordinary reasonable man."
In Borland v. Sanders Lead Co., 369 So.2d 523
(Ala. 1979), this Court observed that determining whether the invasion of a property interest is a trespass or a nuisance requires an analysis of the interest interfered with. "If the intrusion interferes with the right to exclusive possession of property, the law of trespass applies. If the intrusion is to the interest in use and enjoyment of property, the law of nuisance applies." 369 So.2d at 529. The Court inBorland also noted that conduct that rises to the level of a trespass would, generally speaking, support a nuisance action; however, the converse is not always true.369 So.2d at 529 n. 1.
In this case, the Golf Club' legal authority to enter onto the Boyces' land would bar the Boyces' trespass claim but not necessarily bar their nuisance claim. Although the Golf Club had the right to enter and use the Boyces' property for a limited purpose, evidence might establish that the Golf Club had exceeded that purpose to the point of intruding on the Boyces' right to use and enjoy their property. However, the Boyces did not argue this issue in their briefs, and we, therefore, cannot address on appeal their nuisance claim. See Tucker v.Cullman-Jefferson Counties Gas Dist, 864 So.2d 317, 319
(Ala. 2003) ("`An appeals court will consider only those issues properly delineated as such, and no matter will be considered on appeal unless presented and argued in brief.'" (quotingBraxton v. Stewart, 539 So.2d 284, 286
(Ala.Civ.App. 1988))).
 Claims Against the Title Companies
The Boyces allege that the title companies negligently or wantonly failed to inform them of the existence of the recorded license agreement and negligently or wantonly performed their contractual duties in searching the records of the probate court. The Boyces also allege that the title companies suppressed from the Boyces the existence of the recorded license agreement and that the title companies breached the title insurance policy issued to the Boyces. Without explaining its rationale, the trial court granted the title companies' motions for summary judgment. We address each of these claims in turn.
We readily dispose of the Boyces' negligence and wantonness claims against both Stewart Title Guaranty Company and Birmingham Title Services Corporation, because those claims are barred by the two-year statute of limitations established in § 6-2-38, Ala. Code 1975. Because the license agreement and the amendment were recorded when title to the property was conveyed to the Boyces, the Boyces were charged with constructive notice of those recordings as of the date they purchased the property — January 28, 1997. Therefore, they had two years from that date to bring their negligence and wantonness claims. Because the Boyces did not assert those claims until April 2002, those claims are time-barred.[2] *Page 947 
The Boyces' suppression claim against the title companies is also governed by a two-year statute of limitations. As discussed above, because the license agreement and the amendment had been recorded before the date the Boyces obtained title to the property, they are charged with constructive notice of that recording. The two-year limitations period applicable to the suppression claim began to run on that date. The Boyces did not assert their suppression claim against the title companies until some five years after that claim accrued; that claim is time-barred, and the summary judgment for the title companies on that claim is affirmed.
Next, the Boyces assert a breach-of-contract claim against both title companies. They allege that the title companies breached the title insurance policy issued to the Boyces because that policy did not reveal the existence of the recorded license agreement or the recorded amendment to the license agreement. We briefly review the facts relevant to this claim.
On January 8, 1997, Birmingham Title Services Corporation issued a title commitment in preparation for the closing on the property. This title commitment named the Boyces as the "proposed insureds" and stated that an ``ALTA Owners Policy" was to be issued in the amount of the purchase price. The title commitment identified certain requirements to be complied with before the policy would be issued and identified certain exceptions that would or could be contained in Schedule B of the policy. Under the heading of "Exceptions," the title commitment provided:
 "Schedule `B' of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:
 "Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof, but prior to the date the proposed insured acquires for value or record the estate or interest or mortgage thereon covered by this Commitment."
The title commitment then outlined the "Standard Exceptions" that would be included in the title policy.
On March 14, 1997, Birmingham Title Services Corporation issued a title policy in the name of Stewart Title Guaranty Company. The policy was issued with an effective date of March 14, 1997, and named the Boyces as the "insureds." The title policy provided, in pertinent part:
 "SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, STEWART TITLE GUARANTY COMPANY, . . . insures, as of Date of Policy shown in Schedule A, against loss or damage . . .:
 "1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
 "2. Any defect in or lien or encumbrance on the title;
 "3. Unmarketability of the title; *Page 948 
 "4. Lack of a right of access to and from the land.
 ". . . .
 "EXCLUSIONS FROM COVERAGE
 "The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
 ". . . .
 "3. Defects, liens, encumbrances, adverse claims or other matters:
 "(a) created, suffered, assumed or agreed to by the insured claimant;
 "(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company, by the insured claimant prior to the date the insured claimant became an insured under this policy;
 "(c) resulting in no loss or damage to the insured claimant;
 "(d) attaching or created subsequent to Date of Policy; or
 "(e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy."
Schedule B of the title policy provides, in pertinent part:
 "This policy does not insure against loss or damage . . . which arises by reason of:
 "1. Easements or claims of easements, not shown by the public records."
Additionally, the title policy provided that it was "a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described."
The Boyces rely on Ex parte Steadman, 812 So.2d 290
(Ala. 2001), and Parker v. Ward, 614 So.2d 975
(Ala. 1993), in alleging that title companies have a "contractual duty to search [the title] records and to disclose to its insured a defect in the title that those records contained."Parker, 614 So.2d at 978. They allege that on the date the title policy was issued, the license agreement and the amendment had been recorded but that the existence of that agreement and amendment is not disclosed in the title policy or excepted or excluded from the coverage of the policy. Therefore, the Boyces argue, the title companies failed to do what they contracted to do, and they are in breach of their title policy.
In Parker v. Ward, this Court stated: "`[a] defect in title exists when the aggregate of rights, privileges, powers and immunities known as ownership [fee simple title] is subject to the claims of others.'" 614 So.2d at 977 (quoting TitleInsurance: The Duty to Search, 71 Yale L.J. 1161, at 1161 (1962)). The Parker Court also stated:
 "A title insurance company has an obligation to answer for any loss due to a defect in a title if it has not excepted that defect from its coverage. It cannot escape liability when it does not except a defect that is a matter of public record. It is generally assumed that a title defect that appears in the public records but that is not noted is covered by a title policy.
 "Commentators have urged, and some courts have held, that a title company, in the absence of an express promise to search title, has an implied duty to search the title and disclose any defect found upon the public record. Because the policy itself insures against loss or *Page 949 
damage from defects in the title, subject to certain exceptions set out in the policy, it necessarily follows that it insures against any defect that it is a matter of public record if that defect is not excepted from the coverage."
614 So.2d at 977 (footnotes citing Q. Johnstone, TitleInsurance, 66 Yale L.J., 492 at 492 (1957), and TitleInsurance: The Duty to Search, 71 Yale L.J. at 1166 n. 32, omitted).
After reviewing the language of the title policy and construing the evidence presented to the trial court in a light favorable to the Boyces, see Hollingsworth v. City of RainbowCity, 826 So.2d 787 (Ala. 2001), we conclude that the summary judgment in favor of Stewart Title Guaranty Company on the Boyces' breach-of-title-policy claim was improper. The Boyces have presented substantial evidence indicating that a valid and binding contract of title insurance was issued in the name of Stewart Title Guaranty Company; that this contract of title insurance named the Boyces as the insureds; that the Boyces paid a consideration for that policy; and that the policy issued to the Boyces failed to disclose a recorded encumbrance against the property. If the Boyces establish that they have been damaged as a result of this undisclosed recorded encumbrance, they are entitled to indemnity by the title insurer. Therefore, we reverse the summary judgment entered in favor of Stewart Title Guaranty Company on the breach-of-contract claim, and we remand this cause to the trial court for further proceedings against Stewart Title consistent with this opinion.
However, we affirm the summary judgment entered in favor of Birmingham Title Services Corporation on the breach-of-contract claim. The Boyces have not alleged or established that Birmingham Title issued the title policy in its own name or that Birmingham Title intended to bind itself to the contract of title insurance. "`The general rule in Alabama concerning liability of an agent for the breach of contract entered on behalf of a disclosed principal is that the agent bindseither the principal or himself to the contract, but not both.'"Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126, 1129
(Ala. 1992) (quoting Shirley v. Lin, 548 So.2d 1329,1333 (Ala. 1989)).
Because it has not been established that Birmingham Title acted as anything other than an agent for Stewart Title, the Boyces have not established that Birmingham Title could be liable for breach of that policy. We affirm the summary judgment entered in favor of Birmingham Title.
 Conclusion
As to the Casseses, we affirm the summary judgment entered on the Boyces' claims of fraudulent misrepresentation, fraudulent suppression, and conspiracy; we reverse the summary judgment on the Boyces' claim alleging a breach of the warranty deed. As to the Golf Club, we affirm the summary judgment in all respects. As to Birmingham Title Services Corporation, we affirm the summary judgment on all claims asserted against it. As to Stewart Title Guaranty Company, we affirm the summary judgment on the claims of negligence, wantonness, and fraudulent suppression, and we reverse the summary judgment on the claim of breach of the title policy. We remand this case for further proceedings consistent with this opinion.
APPLICATION OF BIRMINGHAM TITLE SERVICES CORPORATION GRANTED; APPLICATION OF STEWART TITLE GUARANTY COMPANY OVERRULED; OPINION OF JANUARY 13, 2006, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; *Page 950 
REVERSED IN PART; AND REMANDED.
NABERS, C.J, and SEE, LYONS, HARWOOD, WOODALL, SMITH, BOLIN, and PARKER, JJ, concur.
[1] Although other golf tournaments are also subject to the agreement at issue here, we mention the Bruno's Golf Tournament only because that is the tournament that gave rise to the license agreement at issue in this case.
[2] The Boyces argue that the statute of limitations on their negligence and wantonness claims against the title companies was tolled until they discovered the existence of the recorded license agreement. This argument is meritless. Under the facts of this case, which involves the recordation statute, the Boyces are charged with constructive notice from the date the document was recorded. Additionally, we point out that Alabama has no "discovery rule" with respect to negligence or wantonness actions that would toll the running of the limitations period. See Henson v. Celtic Life Ins. Co., 621 So.2d 1268,1274 (Ala. 1993).