[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 795 
This petition for a writ of certiorari challenges the judgment entered by the Elmore Circuit Court in favor of Melvin Wayne Abernathy, Neda J. Abernathy, Smokerise, LLC, and James M. Scott, individually and as a, general partner of Smokerise, LLC, the defendants in the proceeding below (hereinafter referred to collectively as "the respondents"). The Smokerise Homeowners Association, Anthony and Linda McLeod, Cecil and Adrienne Brendle, and Brenda and Frederick Sides (hereinafter referred to collectively to as "the petitioners") filed an action involving certain restrictive covenants applicable to Smokerise, a residential subdivision in Elmore County. After the trial court entered a summary judgment for the respondents, the petitioners appealed the judgment to the Court of Civil Appeals. That Court affirmed the judgment without an opinion, SmokeriseHomeowners Ass'n v. Abernathy (No. 2021002, May 6, 2005),945 So.2d 494 (Ala.Civ.App 2005) (table); the petitioners subsequently petitioned this Court for a writ of certiorari to review that decision. We granted the petition, issued the writ, and directed the parties to submit briefs. After reviewing those briefs and the record, we now quash that writ.
 I. Facts and Procedural History
The events underlying this proceeding span 15 years. The Smokerise subdivision was developed in the early 1990s by Smokerise, LLC, and James M. Scott (hereinafter referred to collectively as "the developer"). Before the subdivision development began, the developer in 1987 conveyed to the Abernathys approximately 75 acres that are contiguous to, and lie generally east of, the Smokerise subdivision ("the Abernathy tract").
By 1991 the developer had begun marketing the residential lots in the Smokerise subdivision. According to the subdivision plat, many of the lots were configured along streets terminating in cul-de-sacs, over which through traffic could not travel. In March 1991 the Sideses contracted with the developer to purchase lot 13 in the Smokerise subdivision. The developer executed a similar contract with the McLeods in April 1991 to buy lot 12. Both lots 12 and 13 are on a cul-de-sac.
Three filings relating to the Smokerise subdivision were made in the Elmore County Probate Court and are pertinent here. The first was the developer's filing in August 1991; in that filing, it recorded plat 4 and the restrictive covenants for the subdivision ("the August 1991 filing"). That plat reflected a 15-foot-wide access road ("the 15-foot road") between lots 12 *Page 796 
and 13 of the subdivision. The 15-foot road, which wasoutside the subdivision boundary, provided access between the Abernathy tract and the cul-de-sac serving lots 12 and 13.[1] The pertinent restrictive covenants in the August 1991 filing stated:
 "2.(B). Dwelling Site: . . . Parcels may be subdivided into smaller lots or parcels if said parcel contains at least 2-1/2 acres with suitable road frontage.
 ". . . .
 "9. Nuisances: . . . All parcels covered by these restrictions shall be limited to residential use only and no noxious or offensive trade or activity shall be conducted upon this parcel nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.
 ". . . .
 "12. Driveways and Road: . . . There shall be no easements or rights of access granted across any platted lot to any contiguous lands except as shown on the plat, and, except as may, in the future, be granted across lot 6 and lot 12."
(Emphasis supplied.)
By September 1991, the developer and the Abernathys were in disagreement concerning access to the Abernathy tract. In anticipation of defending against a claim by the Abernathys, the developer negotiated with the Sideses and the McLeods to acquire additional access across their lots to the Abernathy tract. In connection with those negotiations, on September 10, 1991, the developer filed the second of the three pertinent probate records, a modification to the August 1991 filing entitled "Correction to Restrictive and Protective Covenants for Smokerise Subdivision, Plat 4" ("the covenant modification"). The developer did not refile a subdivision plat in September 1991. The covenant modification stated:
 "There shall be no easements or rights of access granted across any platted lot, to any contiguous lands except as shown on the plat, and, except as may, in the future, be granted
across lot 6 and across a 45-foot wide parcel of land on the southern end of lot 13, the same being parallel to the 15-foot strip between lots 12 and 13."
(Emphasis supplied.) This modification thus replaced the original language in covenant 12, which contemplated access "across lot 6 and lot 12," with language allowing access "across lot 6 and across a 45-foot wide parcel of land on the southern end of lot 13. . . ." The modification also stated that the developer was "the current owner of all the lots comprising [the] plat [filed in August 1991]."
The developer drafted, but did not sign, the following letter to the McLeods dated September 19, 1991, concerning the negotiations for additional access:
 "[We] have amended the plat on Smokerise to eliminate any possibility of easements or roads being granted through Lot 12 to the [Abernathy tract] behind you. This means we will be conveying you the entire interest in [lot 12] and will not be asking you to take the 45' strip we earlier talked about.
 "I worked out with Captain Sides that any road which could possibly go to the [Abernathy tract] behind you would come through his Lot 13 instead."
(Emphasis supplied.) The McLeods attested that they never received this letter.
The McLeods closed on their purchase of lot 12 on October 2, 1991. The Sideses purchased lot 13 the following day. When *Page 797 
the developer conveyed lot 13 to the Sideses, it excepted and retained title to the 45-foot-wide strip of land on the southern end of lot 13 that was parallel to the 15-foot road between lots 12 and 13 — the same parcel referenced in the covenant modification ("the 45-foot parcel").[2] Mr. Sides attested that, when he agreed that the developer could retain title to the 45-foot parcel, he understood that the Abernathys owned the land behind his lot, that the Abernathys planned to build a home there in which to retire, that three or four homes would be built on the Abernathy tract for members of their family, and that the 45-foot parcel would be used as a private drive for that family.
During 1992 the Sideses embarked on their plans to build a house on lot 13. To assist the Sideses in positioning the house on lot 13, in August 1992 the developer sold them an additional 20 feet of property that was north of and contiguous to lot 13. Because that 20-foot parcel was not in lot 13 of the plat filed in August 1991, yet another recording in the probate court — the third of those pertinent here — was made in probate court in August 1992 to reflect that boundary change to lot 13 ("the second amendment").
The materials filed with the second amendment included a modified version of the plat ("plat 4A") that was signed by the developer, the Sideses (then the owners of lot 13), and the necessary county officials. The McLeods owned lot 12 when the second amendment was filed, but they did not sign plat 4A or any of the other instruments that were recorded with the second amendment. Another set of restrictive covenants for the subdivision also was recorded with the second amendment. That set restated the restrictive covenants exactly as they were stated in the August 1991 filing. Specifically, covenant 12 filed with the second amendment read exactly as it had in August 1991; it prohibited access through the subdivision to contiguous land "except as may, in the future, be granted across lot 6 and lot 12." Covenant 12 as rendered in August 1992 did not use the language in the covenant modification to the covenants that had been filed in September 1991 and that specifically contemplated access between the Smokerise subdivision and the Abernathy tract by way of the 45-foot parcel.
The Abernathys' dispute with the developer concerning access to their 75-acre tract intensified in 1992. Early in 1992 the Abernathys filed a private condemnation action against the developer in the probate court, seeking to acquire access to the Abernathy tract across lot 12 of the Smokerise subdivision. In that action, the Abernathys alleged that improvements in the subdivision and the public dedication of the street serving lots 12 and 13 denied them access to a public road that had previously provided ingress to and egress from the Abernathy tract. The Abernathys prevailed on their condemnation claim in the probate court, but the developer appealed that decision to the circuit court.
In an effort to settle that condemnation litigation, in May 1993 the developer conveyed to the Abernathys fee simple interest in the 60-foot-wide parcel of property between lots 12 and 13 ("the 60-foot parcel") that it then owned ("the 1993 conveyance"). That 60-foot parcel comprised two segments: the 15-foot road and the 45-foot parcel, which the developer had retained in October 1991 when it sold that lot to the Sideses. The settlement agreement in the condemnation litigation contemplated that the 60-foot parcel would be the access point between a public road in the subdivision and the Abernathy tract, that *Page 798 
the Abernathys would develop and sell residential lots on their 75-acre tract to the general public, and that, with respect to their own development, the Abernathys would abide by the restrictive covenants applicable to the Smokerise subdivision. Except for the developer, none of the McLeods, the Sideses, or any other landowner in the Smokerise subdivision was a party to the condemnation action.
During the same period in which the developer settled the condemnation action, the Brendles negotiated and committed to purchase lot 14-A in the Smokerise subdivision. That lot is across the street from the 15-foot road between lots 12 and 13 shown on the subdivision plat. Before that purchase, the Brendles asked the real-estate agent marketing the subdivision for the developer about the purpose of the 15-foot road. The Brendles attested that the agent advised them that it was a private road used to access the Abernathy tract for hunting. The Brendles purchased lot 14-A in October 1993. Before they purchased the lot, they were furnished a copy of the materials filed with the second amendment. Even though the covenant modification was recorded approximately two years before the Brendles purchased lot 14-A, there is no evidence indicating that the Brendles reviewed that modification, which contemplated access to the Abernathy tract over the 45-foot parcel. Further, there is no evidence indicating that the Brendles actually knew in October 1993 about the condemnation litigation that had been settled several months before their purchase or knew that the developer had retained title to the 45-foot parcel when it conveyed lot 13 in 1991 and subsequently conveyed the 60-foot parcel, which included the 45-foot parcel, to the Abernathys.
Early in 2002 the Abernathys began clearing trees and constructing a road on the 60-foot parcel. Before that, the 15-foot road had been cleared, but the 45-foot parcel remained wooded. The petitioners learned that the Abernathys had filed a plat with county authorities in the spring of 2002 seeking approval to subdivide the Abernathy tract into 29 homesites. Concerned that the Abernathys' construction and use of the 45-foot parcel as a road tract would alter the secluded nature of the Smokerise subdivision, the petitioners sued in June 2002 to prevent the use of the 45-foot parcel by the Abernathys as a road, and to declare the Sideses as the "rightful owners" of the 45-foot parcel.
Specifically, the petitioners asked the circuit court to reform (a) the October 1991 deed in which the developer conveyed lot 13 to the Sideses and retained title to the 45-foot parcel and (b) the May 1993 deed in which the developer conveyed the 45-foot parcel to the Abernathys as one of the two segments constituting the 60-foot parcel. The gist of the petitioners' complaint is that those conveyances were invalid because, they argued, each violated restrictive covenant 12 as it read in the August 1991 filing and the second amendment (granting access to contiguous land through the subdivision only over lots 6 and 12) and covenant 2(B) (prohibiting the subdivision of parcels of less than 2.5 acres). The petitioners' complaint also asserted a nuisance claim against the Abernathys, alleging that the construction of a road on the 45-foot parcel had already caused, and the projected volume of traffic over that road would cause, "hurt, inconvenience and damage." Finally, under a trespass theory, the petitioners claimed damages from the Abernathys related to their removal of trees from the 45-foot parcel.
The parties filed cross-motions for a summary judgment in the trial court. On June 12, 2003, that court entered a summary *Page 799 
judgment for the respondents on all of the petitioners' claims.[3] The petitioners appealed, and this Court transferred that appeal to the Court of Civil Appeals pursuant to § 12-2-7(6), Ala. Code 1975. That court affirmed the summary judgment, without an opinion, and the petitioners then sought review in this Court.
 II. Issue Presented and Standard of Review
The petitioners appeal the trial court's adverse disposition of their deed-reformation, nuisance, and trespass claims.[4]
Because the trial court entered a summary judgment on those claims, the following standard applies:
 "`This Court's review of a summary judgment is de novo. We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P. In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce "substantial evidence" as to the existence of a genuine issue of material fact. Ala. Code 1975, § 12-21-12. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."'"
Prince v. Poole, 935 So.2d 431, 442 (Ala. 2006) (quotingDow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39
(Ala. 2004)) (citations omitted). Further, when reviewing a summary judgment, we consider the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant, Prowell v. Children's Hosp. ofAlabama, 949 So.2d 117, 126 (Ala. 2006), and we consider questions of law de novo. Alabama Elec. Coop., Inc. v.Bailey's Constr. Co., 950 So.2d 280 (Ala. 2006).
 III. Analysis A Deed-Reformation, Claim
The Abernathys' title to and right to use the 15-foot road to access the Abernathy tract are not in dispute. The plats included with the August 1991 filing and the second amendment depicted that road, which was situated between lots 12 and 13, as being outside the boundary of the Smokerise subdivision. The petitioners knew of the existence of the 15-foot road and the intended use of it as the means of access to the Abernathy tract before they purchased their lots. Accordingly, they do not contest the Abernathys' interests in the 15-foot road.
The petitioners' claims address exclusively the 45-foot parcel the developer retained when it conveyed lot 13 to the Sideses in October 1991 and then subsequently conveyed to the Abernathys (along with title to the 15-foot road) in May 1993. *Page 800 
The petitioners contend that the trial court should have reformed the deeds for those two transactions and transferred title to the 45-foot parcel to the Sideses, because those conveyances violated restrictive covenants 12 and 2(B). The petitioners argue that they have standing to seek that relief because when a developer adopts a general scheme for development and restricts the use of lots in the development, "such restrictions create equitable easements in favor of the owners of the several lots which may be enforced in equity by any one of such owners." Allen v.Axford, 285 Ala. 251, 259, 231 So.2d 122, 129 (1969).
Chronologically, the pivotal transactions concerning the 45-foot parcel were the covenant modification in September 1991, the retention by the developer of the 45-foot parcel when it conveyed lot 13 in October 1991, and the May 1993 conveyance (hereinafter referred to collectively as "the key transactions"). In denying the deed-reformation claim, the trial court concluded that, during the early 1990s, the petitioners had actual notice of the key transactions and the intended use of the 45-foot parcel as access to the Abernathy tract.[5] The trial court attributed significant weight to evidence indicating that in September 1991 the developer had negotiated with the McLeods and the Sideses — then under contract to buy lots 12 and 13 — for the purpose of the developer's acquiring additional property to access contiguous lands. It concluded that the Sideses and the McLeods had received consideration from the developer in connection with its retention of title to the 45-foot parcel. That court also found that certain petitioners had knowledge of, and were bound by actions taken in, the condemnation litigation between the Abernathys and the developer. Based on its findings of actual knowledge, the trial court ruled that the deed-reformation claim was barred by the equitable defenses of laches and estoppel.[6]
The petitioners effectively argue that they presented evidence in the trial court that disputed the argument that they had actual knowledge in the 1990s of the key transactions and the intended use of the 45-foot parcel. When the evidence is viewed, as it must be, in the light most favorable to the petitioners, their argument has merit. Notwithstanding, even if there were genuine issues of material fact concerning the extent of the petitioners' actual knowledge, the trial court correctly entered a summary judgment for the respondents for the following reasons.
The trial court made the following conclusions of law in its June 12, 2003, order: *Page 801 
 "The legal issues of establishing the rightful owner of the disputed [45-foot] strip of land, the [ Abernathys' right of] use of the land, and the original owner's [i.e., the developer's] right to except certain lands from the subdivision are decided in favor of the [respondents]."
These legal findings concerning the Abernathys' use and title to the 45-foot parcel were correct because the petitioners hadconstructive notice that that parcel was to be used as a means of access to contiguous property.
The recordation of the covenant modification in September 1991 is instrumental here. The original wording of restrictive covenant 12 prohibited access from any platted lot in the Smokerise subdivision to contiguous lands "except as shown on the plat, and except as may, in the future, be granted across lot 6 and lot 12." When the developer recorded the covenant modification, the revised language permitted access "across a 45-foot wide parcel of land on the southern end of lot 13. . . ."
To avoid the clear language in the covenant modification, the petitioners argue that the filing of the modification was not effective. The developer filed that modification after the Sideses and the McLeods contracted to purchase their respective lots, but before the closing of those transactions. Neither the Sideses nor the McLeods executed or approved the covenant modification. Because the Sideses and the McLeods had an equitable interest in their lots when the covenant modification was filed, the petitioners contend that the modification was ineffective absent the consent of the Sideses and the McLeods.[7] Stated differently, the petitioners argue that, based on the authority of Davis v. Williams,130 Ala. 530, 30 So. 488 (1900), the Sideses' and McLeods' equitable interests could not be "diminished" without their consent.
Neither party has directed us to an Alabama decision that addresses whether a party holding equitable title to realty must consent to a filing concerning that property made by the record owner during the period between the execution of a purchase agreement and the transfer of legal title. The petitioners rely on Loventhal v. Home Insurance Co., 112 Ala. 108,20 So. 419 (1896), in support of their argument. In that case the plaintiff made a claim under a fire-insurance policy for damage to certain property she had contracted to purchase. This Court held that the plaintiff owned equitable title to that realty, and that that interest prevented the defendant from denying payment on a policy exclusion that excluded damage to property "not owned by the insured in fee simple." 112 Ala. at 112,20 So. at 420-21. Loventhal did not, however, address the issue presented here.
In Boyce v. Cassese, 941 So.2d 932 (Ala. 2006), this Court considered a recordation situation involving constructive notice. The plaintiffs in Boyce agreed to purchase land adjacent to a golf course. Only four days before closing, an easement agreement was recorded that granted a golf club operating the adjacent course the right to use the land the plaintiffs were purchasing during golf tournaments. That easement was not recorded when the plaintiffs contracted to buy the land, and they closed on the purchase without actually knowing of its existence. After the plaintiffs learned of the easement, they sued to invalidate the easement agreement, rescind their realty purchase, and *Page 802 
recover damages on multiple tort theories. Notwithstanding the plaintiffs' lack of notice of the easement before closing, this Court held that the easement ran with the land and that it was binding on the plaintiffs. The Court also reasoned that the recordation of the easement charged the plaintiffs with constructive notice for purposes of applying statute-of-limitation defenses on the various tort claims:
 "`Under Ala. Code 1975, § 35-4-90, the proper recordation of an instrument constitutes "conclusive notice to all the world of everything that appears from the face" of the instrument. Thus, purchasers of real estate are "presumed to have examined the title records and knowledge of the contents of those records is imputed [to them]."'
 "Haines v. Tonning, 579 So.2d 1308, 1310
(Ala. 1991) (quoting Christopher v. Shockley, 199 Ala. 681, 682, 75 So. 158, 158 (1917), and Walker v. Wilson, 469 So.2d 580, 582
(Ala. 1985)).
 "It is undisputed that the Golf Club recorded the license agreement and the amendment to the license agreement on January 24, 1997, a few days before the Boyces acquired their interest in the property. Because the agreement was recorded at the time the Boyces obtained title to the property, they are charged with notice of the recorded agreement as of that time. This action was filed in April 2002, more than five years after the Boyces obtained title to the property and more than five years after the Boyces are charged with notice of the encumbrance against their property. For this reason, the Boyces' claims of fraudulent misrepresentation and fraudulent suppression against the Casseses are time-barred."
941 So.2d at 943 (emphasis supplied).
As in Boyce, the respondents argue that, when the covenant modification was filed in September 1991, the developer owned all the lots in the Smokerise subdivision. Accordingly, they contend that any person who subsequently purchased a lot in the subdivision took title to the lot subject to the terms of that modification. Applying the recordation principles stated inBoyce, we agree with the respondents.
We also reject the petitioners' argument that the covenant modification was ineffective under Ala. Code 1975, § 35-2-53. Section 35-2-53 provides, in pertinent part, that "[a]ny plat or map . . . may be vacated by the owner . . . of the lands at any time before the sale of any lot therein by a written instrument declaring the same to be vacated, executed, acknowledged and recorded in like manner as conveyances of land. . . ." (Emphasis supplied.) It further states that "[w]hen lots have been sold, the plat or map may be vacated, in the manner herein provided by all the owners of lots in such plat or map joining in the execution of such writing." (Emphasis supplied.) According to the petitioners, the covenant modification partially vacated the August 1991 filing; neither the McLeods nor the Sideses signed the modification instrument. Because the McLeods and the Sideses held equitable interests in lots 12 and 13 when the covenant modification was filed, the petitioners argue, the recordation of the covenant modification did not satisfy the requirement in § 35-2-53 that "all the owners of lots in [the] plat . . . join in the execution of [the modification] writing." This argument fails because it contravenes the ordinary meaning of the words "owner" and "sale" in § 35-2-53. Black's Law Dictionary 1137, 1364 (8th ed.2004), defines an "owner" as "[o]ne who has the right to possess, use, and convey something," and a "sale" as "[t]he transfer of property or title for a price." The McLeods and the Sideses *Page 803 
could not possess or use lots 12 and 13 when the covenant modification was filed; accordingly, at that time they were not "owners" of those lots within the ordinary meaning of §35-2-53. Further, the plain meaning of the word "sale" in that statute connotes the time at which legal, not equitable, title is transferred by deed for a price. The developer thus had the exclusive right under § 35-2-53 to file the covenant modification in September 1991 because it then owned all the lots in the subdivision.[8]
Our conclusion is buttressed by Jefferson County v.Mosley, 284 Ala. 593, 226 So.2d 652 (1969). In that case Dillard delivered a right-of-way deed to the County in 1945. Six years later, Dillard conveyed property to Mosley and delivered a deed to him that, in its description, included the same land Dillard had previously conveyed to the County. The deed transferring the property from Dillard to the County was not recorded until after the Dillard-Mosley transaction. Mosley's deed stated that the title he received from Dillard was subject to unspecified public roads, easements, or rights-of-way. TheMosley Court was confronted with the issue whether Mosley was an innocent purchaser with respect to the County's right-of-way interest or took title subject to that interest. In ruling for the County, this Court stated:
 "It is difficult to understand how Mosley could have read the deed and not have seen the exception clause. Whether he saw it or not, he is presumed to have knowledge of it and the consequences are the same in either case. [Citation omitted.]
 "So far as the record discloses, Mosley made no effort to ascertain whether, in fact, there were any public roads, easements or rights-of-way across the land described in the deed from Dillard to him prior to the present controversy. After the controversy arose, apparently he had no trouble in ascertaining such information, as is evidenced by the map or drawing which is in the record.
 "It seems to us that a reasonably prudent man who obtained a deed containing an exception such as was included in the deed from Dillard to Mosley would have made inquiry from his grantor as to why such an exception was included. If such an inquiry had been made, Mosley would no doubt have been advised of the right-of-way deed executed by Dillard to Jefferson County in 1945."
284 Ala. at 601, 226 So.2d at 658-59. Similar toMosley, the operative probate record *Page 804 
here — the covenant modification — constituted notice to the petitioners that access to contiguous lands could be granted over the 45-foot parcel. Their deed-reformation claim thus fails.
In summary, regardless of whether the McLeods and the Sideses consented to the covenant modification, that September 1991 filing was effective and constituted "notice to the world" that access between platted lots in the subdivision and contiguous land could be granted over the 45-foot parcel. Because that modification was duly recorded before the developer sold any lots in the subdivision, the petitioners — subsequent purchasers of those lots — were charged with constructive notice of its terms as a matter of law. Under these circumstances, the developer did not violate restrictive covenant 12 (as revised in September 1991) when it conveyed access to the Abernathys. Moreover, the developer did not breach covenant 2(B) when it sold lot 13 to the Sideses in 1991 but retained the 45-foot parcel. That restriction stated that lots in the subdivision could be subdivided only "if said parcel contains at least 2-1/2 acres with suitable road frontage." Even though the 45-foot parcel contained only a fraction of an acre when it was parced from lot 13, covenant 2(B) was not violated because, notwithstanding its terms, the petitioners had constructive notice before their respective purchases of lots that that parcel subsequently could be used as access to contiguous land. Because the respondents did not violate restrictive covenants 12 or 2(B), the trial court correctly entered a summary judgment for them on the deed-reformation claim.
 B. Nuisance Claim
The petitioners made two principal factual allegations in their common-law nuisance claim against the Abernathys: (1) that the clearing of trees, the use of road machinery, and the construction activities on the 45-foot parcel caused hurt and inconvenience to the petitioners, and (2) that the future use of the 45-foot parcel as a means of access to the Abernathy tract would significantly increase the volume of traffic through the subdivision, causing further hurt and inconvenience. Finding that the Abernathys' use of the 45-foot parcel was "within the legally prescribed and permitted uses," the trial court concluded that "[n]othing in the pleadings [rose] to the proof required to prevail on a nuisance count."
The construction of a road on the 45-foot parcel to access the Abernathy tract was reasonably foreseeable after the developer recorded the covenant modification in September 1991. The petitioners have not shown that the Abernathys used the 45-foot parcel in a manner inconsistent with its intended use. Furthermore, the petitioners' argument that the future traffic volumes over the 45-foot parcel will constitute a common-law nuisance is speculative. Accordingly, summary judgment for the respondents was correctly entered on the nuisance claim.
 C. Trespass Claim
The petitioners' trespass claim against the Abernathys assumed that the Abernathys did not have the right to enter the 45-foot parcel to construct a road or to remove trees from that parcel. That parcel was part of the 60-foot parcel the developer conveyed to the Abernathys in May 1993. Because the developer was authorized by the restrictive covenants for the subdivision to retain the 45-foot parcel when it conveyed lot 13 in October 1991, its subsequent conveyance of that parcel to the Abernathys was valid. Given that the Abernathys owned and had the right to possess the 45-foot parcel after May 1993, *Page 805 
the trial court correctly ruled for the respondents on the trespass claim.
 IV. Conclusion
For the reasons stated above, the Court of Civil Appeals correctly affirmed the trial court's summary judgment for the respondents on all claims. The writ of certiorari previously issued in this proceeding is due to be quashed.
WRIT QUASHED.
SEE, HARWOOD, STUART, and BOLIN, JJ., concur.
[1] We refer to the street serving lots 12 and 13 as a "cul-de-sac" even though, because of the existence of the 15-foot road, it was not totally closed to through traffic.
[2] The 45-foot parcel was approximately 50 feet long and generally rectangular in shape.
[3] The trial court denied the respondents' motion for a summary judgment to the extent that the trespass claim sought damages for removal of trees "beyond the 45' strip." The petitioners dismissed that claim before they filed their appeal.
[4] The petitioners also sought an injunction in the trial court to prevent the Abernathys from clearing trees on the 45-foot parcel or from using the name "Smokeridge" in marketing their residential development. The petitioners do not make any arguments concerning those claims for injunctive relief in this appeal.
[5] Addressing the petitioners' actual knowledge of the key transactions, the trial court made the following factual findings in its June 12, 2003, order: "[T]he exhibits tend to establish that both [the McLeods and the Sideses] were fully aware of the intended use of the 60' foot strip at the time of the negotiation and purchase of their lots"; "the conveyance [of lot 13 in which the developer retained title to the 45-foot parcel] and subsequent condemnation proceedings . . . made the intended use of the 45'"; and "[c]learly the compensation and acreage adjustment to the [petitioners'] lots and the condemnation proceedings either put the [petitioners] on notice or should have placed them on notice of the actions or intended actions of the . . . Abernathys and even more clearly to the matter of ownership of the 45-foot strip of land."
[6] The application of those defenses in an action to enforce a restrictive covenant involves mixed questions of law and fact. See Tubbs v. Brandon, 374 So.2d 1358, 1360-61
(Ala. 1979). As discussed in Tubbs, a plaintiff must "delay in asserting his rights" before laches is invoked, and estoppel requires evidence "of [the plaintiff's] intent not to enforce his rights." Id. Reliance on either of these doctrines assumes that the plaintiff failed to assert a known right or a right of which he reasonably should have known.
[7] When parties enter into an executory contract to purchase real property, the vendee has an equitable interest in title before the vendor transfers legal title. Grass v. Ward,451 So.2d 803, 805 (Ala. 1984).
[8] We also reject the petitioners' two other arguments as to why the covenant modification was ineffective. First, they argue that the governing body for the subdivision property, the Elmore County Commission, must have approved the filing of the covenant modification. That Commission approved the plats that were recorded in August 1991 and with the second amendment in 1992, but it did not approve the covenant modification. Section35-2-52, Ala. Code 1975, provides that maps andplats must be approved by the governing body in which lands are situated if more than 10,000 persons reside in the subject city or police jurisdiction. Because § 35-2-52 does not reference restrictive covenants, there was no requirement that the Commission approve the covenant modification.
Additionally, the petitioners argue that the filing of the second amendment "revoked" the covenant modification. Assuming that the modification was ineffective, the petitioners posit that the language in covenant 12 of the second amendment, i.e., that access could be granted only as shown on the plat or across lots 6 and 12, controlled. The McLeods owned lot 12 when the second amendment was filed, but they did not sign that amendment. Therefore, the purported restatement of restrictive covenant 12 in the second amendment was a nullity because all owners of lots in the subdivision did not sign that amendment. See above discussion of Ala. Code 1975, § 35-2-53.