BEATTY, Justice.
Plaintiff appeals from a summary judgment in favor of defendant Container Corporation of America (CCA) on plaintiff’s claim for statutory damages for injury to trees.
On August 24, 1979, CCA purchased a tract of land located in Barbour and Dale *399 Counties, which contained approximately 400 acres. In the deed to this tract, reference was made to a 1976 survey of the property by Veston Bush. CCA began clearing the property, relying upon the boundaries as determined by the survey.
Plaintiff, owner of a 100-acre tract of land adjoining the property of CCA, filed the present lawsuit against CCA and other parties unknown. The three-count complaint sought a determination that an ancient fence was the boundary line between the parties, compensatory damages for trespass to plaintiffs land, and statutory damages for injury to the trees in the disputed area.
The issue of the boundary line was tried to the court, which found that plaintiff had acquired title by adverse possession to approximately seven acres of land described in CCA’s deed according to the Bush survey. CCA then filed a motion for summary judgment on the statutory damages claim under count three of the complaint. The trial court granted the motion for summary judgment on the ground that CCA entered the land and cut timber under a reasonable belief that it had title to the property. The summary judgment was made final pursuant to Rule 54(b), A.R.Civ.P., and plaintiff appealed.
An action for statutory damages for destruction of trees lies against a person who cuts down or injures certain varieties of trees on land “not his own, wilfully and knowingly, without the consent of the owner” of the land. Code of 1975, §§ 35-14-1 and 35-14-2. Since the statutes authorizing the action have long been regarded as penal in nature, they are subject to a strict construction, and the requisite intent must be clearly shown before liability may be imposed. Clifton Iron Co. v. Curry, 108 Ala. 581, 583, 18 So. 554, 555 (1895).
The existence of a reasonable belief that the cutting is authorized or that the trees are on one’s own property constitutes a defense to the action. Vick v. Tisdale, 56 Ala.App. 565, 568, 324 So.2d 279, 282 (1975). Moreover, such a belief, even if unreasonable, will preclude liability under these statutes unless the belief is “so patently unreasonable as to constitute a reckless disregard for the ownership of the trees.” Id.
In Vick, the Court of Civil Appeals held that defendants were entitled to a directed verdict because there was no evidence that they willfully, knowingly, or recklessly cut plaintiff’s trees. The court stated:
“The reliance upon a map of general use and notoriety in the county, even though out of date, without inspecting deeds and plats, indicates at best negligence on the part of defendant-appellants, but not of the magnitude sufficient to bring their actions within the statute.” 56 Ala.App. at 568, 324 So.2d at 283.
Similarly, CCA argues that it cannot be held liable for statutory damages because it acted under a belief that the trees were on its own land and its reliance upon its deed and the Bush survey made this belief a reasonable one.
The evidence which distinguishes this case from Vick, however, is the fact that there was an ancient fence'on the property cleared by CCA which, according to the trial court’s finding, marked the true boundary. Although the location of the fence is difficult to determine from the record before us, it is clear from the following testimony of Ronnie Gardner, an employee of CCA who marked the boundaries of the property, that some kind of fence existed:
“Q. When you came down here — this North line that you testified to, Mr. Gardner, when you hit a fence down here, what was it you said about that fence?
“A. It was dilapidated and it was running zigzag back and forth through there in a Northeasterly manner. It didn’t run North — East and West.
[[Image here]]
“Q. Did you find any fence down in here?
“A. The fence came on South of that.
“Q. It just kept on coming, so, there was a definite fence that kept on coming *400 North and South that headed off that way?
“A. It was a fence, yes.
[[Image here]]
“Q. Okay. Going down this way, tell me what you found going toward the dirt road?
“A. Well, we found scrap pieces of fence all along with wire — not really a fence, but pieces of fence that you could pick up that was — that had been a fence and was sticking out of trees.
[[Image here]]
“Q. Then from here was it continuous all the way to the road?
“A. It wasn’t a continuous fence on any of it, it was just pieces that I could pick up going through there.
[[Image here]]
“Q. And then since you came from the road back through these woods, did you find a continuous fence all the way through here back until you get back to this clearing where ya’ll cleared?
“A. Yes, sir.
“Q. So, you found a fence there?
“A. Yes, sir.
“Q. And you found a continuous fence here?
“A. Yes, sir.
“Q. Did you follow this fence that you found continuously on out to the river?
“A. Yes, sir.
“Q. Did it go all the way to the river?
“A. Yes, it went into the river.”
Clyde Gibson, an employee of CCA in charge of the clearing operation, also testified that there was evidence of a fence across the property which was continuous in some places and broken or in pieces in other places. Mr. Gibson estimated that no maintenance had been done on the fence for five to ten years.
Furthermore, both of these employees of CCA testified concerning CCA’s policy regarding establishing boundaries to its property. Mr. Gardner stated as follows:
“Q. Were your instructions to go by the survey regardless?
“A. Right.
“Q. It didn’t matter if there was a fence there that—
“A. That it had been surveyed and to follow it [to] the best of our ability.
“Q. Is that their policy?
“A. Yes, in a case that land was surveyed and painted ahead of us coming in, we follow it.
“Q. Regardless of the number of fences — the fence really didn’t mean that much to you, did it, Mr. Gardner?
“A. No, it didn’t.
“Q. Ya’ll were going to burn, cut, and clear down to your survey?
“A. To our survey line. It wasn’t ours but it was done ahead of us—
“Q. I understand, but that’s your company’s policy and your instructions?
“A. Yes.
[[Image here]]
“Q. Just to get myself straight, it really wouldn’t have made any difference if you had found an intact fence as far as you were concerned and your employer is concerned, would it?
“A. I would have asked more questions about it. I would have gone to my superiors and said, ‘Hey, there is a fence that’s intact up there. Are we supposed to go South of it?’
“Q. Did you tell him about the fence that you found? Your superior?
“A. No, I didn’t.
“Q. You didn’t tell anybody at all about it?
“A. No. I was working with the guy and by it not being intact and us finding a survey that we had followed already around it for three miles, or somewhere in that vicinity, we went by the survey instead of the fence.
“Q. Which were your instructions anyway?
“A. Yes.”
Similarly, Mr. Gibson testified as follows:
“Q. Is it Container Corporation’s policy if they have got a survey to go to the survey lines?
*401 A. Not necessarily, no.
“Q. Okay. If you find a fence, then you just go to the fence or do you go to the survey line?
“A. It depends on the circumstances.
“Q. Did you know that there was a fence there before you directed it to be site cleared?
“A. Yes, sir.
“Q. You did?
“A. Yes.
“Q. Who told you that?
“A. The contractor, if I am not mistaken.
“Q. Who is the contractor?
“A. Cody Dunn was at the time, I believe.
“Q. Did Mr. Gardner tell you that he had found a fence when he had run the boundaries?
“A. No.
“Q. But you did know before you ordered it site cleared that there was a fence there?
“A. Yes.
“Q. So, it was your company’s policy and your company’s instructions to go to your survey regardless.
“A. No, sir.
“Q. Well, didn’t you order, without knowing what the fence looked like, the razing or the site clearing of that property?
“A. I haven’t seen the fence. I asked questions and there was no indication of it being — establishing any ownership.”
A fence is an “outstanding symbol of possession” which, regardless of property descriptions, may become a boundary if it is recognized as such for a certain length of time. Mardis v. Nichols, 393 So.2d 976, 978-79 (Ala.1981). In Louisville & Nashville Railroad Co. v. Hill, 115 Ala. 334, 348, 22 So. 163, 167 (1897), this Court held in a case seeking statutory damages for injury to trees that evidence that plaintiff’s fence had been torn down was admissible to show that the entry onto plaintiff’s land was made willfully and knowingly. In Wiley v. Wilson, 284 Ala. 614, 616-17, 227 So.2d 128, 130-31 (1969), this Court affirmed the trial court’s determination that plaintiff had acquired title to disputed property by adverse possession despite defendant’s removal of two fences erected by plaintiff and that defendant could be held liable for cutting trees on plaintiff’s land.
In the present case, we conclude that CCA was not entitled to a judgment as a matter of law on the basis that its strict adherence to the Bush survey prevented its entry onto plaintiff’s land from being willful, knowing, or in reckless disregard of the ownership of the trees. Rarely is summary judgment appropriate in cases involving the intent of the parties. See Loveless v. Graddick, 295 Ala. 142, 149, 325 So.2d 137, 143 (1975). CCA’s knowledge of the fence and its cutting of timer despite such knowledge provides at least a scintilla of evidence that CCA exhibited reckless disregard for the ownership of the trees.
Therefore, let the trial court’s entry of judgment in favor of CCA on the statutory damages count be reversed and the case remanded to the trial court for further proceedings.
REVERSED AND REMANDED.
MADDOX, FAULKNER, JONES and ADAMS, JJ., concur.
TORBERT, C.J., and SHORES and HOUSTON, JJ., dissent.