MOORE, Judge.
William Samuel Cousins appeals from a judgment entered by the Autauga Circuit Court (“the trial court”) in favor of Patricia McNeel, declaring that McNeel is the owner of certain disputed property, awarding McNeel damages for Cousins’s cutting of timber from the disputed property, and establishing the boundary line between the property owned by McNeel and that owned by Cousins, and in favor of George Houston, from whom Cousins had acquired his property, on Cousins’s third-party claim against Houston alleging breach of a warranty deed. We affirm in part and reverse in part.
Procedural Background[1]
■ In February 2007, McNeel sued Cousins, seeking a judgment declaring the boundary line between their adjacent properties. She also asserted claims, pursuant to Ala.Code 1975, § 35-14-2 and § 9-13-6(2), based on Cousins’s alleged cutting and removal of timber from the disputed property, and common-law claims of trespass, negligence, and wantonness; she sought to recover the value of the timber cut and other damages. Cousins denied McNeel’s allegations, asserting that he was the record owner of the disputed property or, alternatively, that he had acquired title to the disputed property through the doctrines of prescriptive or statutory adverse possession. Cousins also asserted a third-party claim against George Houston alleging breach of the warranty deed by which Houston had conveyed property to Cousins in November 2004.
Beginning on April 27, 2011, the trial court conducted a two-day bench trial; ore tenus evidence was presented at that trial. On May 11, 2011, the trial court entered its judgment, stating, in pertinent part:
“The Plaintiff, [McNeel], having pled her cause of action and provided testimony on the following claims, to wit: Trespass by cutting trees, Declaratory Judgment as to land line, Statutory action for cutting of trees, Common law action for recovery for cutting trees, Statutory action for converting cut timber and for Negligence/Wantonness. Upon hearing the testimony, the Court *849 considers these claims as well as the Third Party Complaint on the warranty in the deed, this Court finds as follows:
“1. That the true, legal and actual east boundary line between ... [the property of MeNeel] and west boundary line of ... [the property of Cousins] is as follows:

“In the SE Quarter of Section I, Township 17, Range 13

“Commencing at the Southeast corner of Section 4, Township 17, Range 13, Autauga County, Alabama, thence west along the South line of said Section 4, 361.5 feet to the point of beginning; thence North 361.5 feet, thence East to the east line of said Section 4, thence North along the east line of said Section 4 to the Northeast corner of the Southeast Quarter of said Section 4.

“In the NE Quarter, Section 9, Township 17, Range 13

“Commencing in Independence Road 24.32 chains South from the Northwest corner of section 10, Township 17, Range 13, Autauga County, Alabama; thence North 24.32 chains, thence West 7.26 chains to the point of beginning, thence South 20 degrees West 22.80 chains, thence South 15 degrees West 7.50 chains to a point on Independence Road.
“2. Court finds that ... [Cousins] cut timber on ... [McNeel’s] property after notice that there was a dispute with his action of cutting, trespassed upon her land and wantonly damaged the property of [MeNeel] .... [T]his Court finds in favor of ... [MeNeel] and against ... [Cousins] on wantonness, double damage for statutory damage and for the lease loss of revenue and assess her damage at $41,050.00 plus cost of Court.
“3. Court finds no indication, proof or inference that ... Cousins nor ... Houston ever did any act of possession on the disputed property until Cousins trespassed after 2004. Therefore the defense of adverse possession does not apply.
“4. Defendant Cousins is directed to immediately and not after 60 days, remove all markings on the ground, trees, fencing, wire, post, tape and pins on or along any of the disputed area other tha[n] the actual, true, legal line established by this Order.
“5. Court finds that ... Cousins got exactly what he bargained for in the property located east of the line established herein. Therefore, there is no[ ] contribution from Houston to Cousins.”
On June 10, 2011, Cousins moved the trial court to alter, amend, or vacate its judgment. In his motion, Cousins asserted, among other things, that it was unclear from the language of the May 11, 2011, judgment whether the trial court had ruled on Cousins’s breach-of-warranty-deed claim against Houston, that the legal descriptions contained in the trial court’s judgment were unsubstantiated and unsupported by any evidence before the trial court, and that MeNeel was not entitled to damages for the cutting of timber from the disputed property. On August 19, 2011, the trial court denied that motion. Cousins timely filed his notice of appeal.

Evidentiary Background

The evidence presented to the trial court established the following pertinent facts. MeNeel owns property in Autauga County, which her now-deceased husband, Joe MeNeel, Jr., had conveyed to her in 2000; McNeel’s husband had inherited that property in the 1970s from his aunt, Stella *850 Underwood. The property had been in Underwood’s family for many years. We refer to this property as “the McNeel property.” It was undisputed that, at the time of the trial, a creek ran near the eastern border of the McNeel property and that a fence was located to the east of the creek, up a hill and some distance away from the creek. Until 2004, Houston owned property lying to the east of and adjacent to the McNeel property. Houston had inherited his property in 1978 from a family member who had owned that property for many years.
In November 2004, Cousins purchased Houston’s property for $500,000. The creek and the fence referenced above, which lied at or near the eastern boundary of the McNeel property, was located at or near the western boundary of Cousins’s property. Whether the boundary line between the two properties was located at the creek or at the fence is at the center of this dispute. The property lying between the creek and the fence is hereinafter referred to as “the disputed property”; according to trial testimony, the disputed property totaled approximately 30 acres.[2]
The following language was included in Cousins’s purchase agreement:
“Seller/s agree to sell and convey to Purchaser/s and the Purchaser/s agree to purchase from Seller/s upon the following terms and conditions, the following described real property, in its AS IS condition: Approximately 250 acres and Residence, Township 17 North, Range 13 East, Sections 3, 4, 9, and 10 in Mulberry Community of Autauga County. Actual acreage must be verified by survey.”
A copy of the deed by which Houston had obtained title to the property was attached to the purchase agreement. Houston’s real-estate agent, Mike Vaughn, arranged for surveyor Ronald Burke to perform the required survey. A copy of correspondence sent by Vaughn to Burke, by facsimile transmission, was introduced into evidence; in that correspondence, Vaughn indicated that, although the deed by which Houston had acquired the property indicated that Houston’s property consisted of 231 acres, Houston had indicated that he believed his property totaled approximately 250 acres. Vaughn also indicated that, according to Houston, the “creek is the line all the way up the west boundary ... there are also a lot of cattle cross fences that do not follow the actual property lines.”
Burke testified that, in preparing the survey, he had consulted records in the county tax assessor’s office, which had indicated that Houston owned approximately 270 acres and that the creek served as the western boundary of Houston’s property. Burke and his crew then located the creek and the pertinent section corners. Using those identifiers, Burke’s survey indicated that Houston’s property totaled 264 acres.
Burke testified that
“[t]he [Houston] deed is vague and not very good to start with, which we run into a lot. A lot of times you have to take a deed and understand what is the intent of the deed because basically they don’t make any sense. It said something about a fence. And in the process of the survey I saw the fence at the top of the hill where the fields met the woods. I asked about the fence.... I was told it was just a fence to keep the cattle from getting to the bottom land.... Mike Vaughn was the only person I ever talked to. And so I didn’t locate the fence because they told me it was just a fence to keep the cattle out of *851 that bottom land that you can’t farm anyway. It’s just like a ravine.... And so as soon as the crew got there, the tax map indicated the fence was the line.... And I did call the tax assessor’s office and ask them, that line does represent the creek, and they said it does. And so I told the survey crew to start locating the creek because it was going to take a while to locate that creek. So that’s the first thing we did was locate that creek. The rest of the lines were just GLO forty lines. So that’s why we went to the creek. I didn’t know if there was a fence down there by that creek at one time and that was the fence that everybody was talking about. And then there was a — something about three acres in the corner of the forty which would be out in the middle of that field which didn’t make any sense. And that’s why I went to the creek.”
Burke testified that “nothing was ever said to me ever that the creek is maybe not the line. No one ever said that.” Burke admitted that, in surveying Houston’s property, he never reviewed the McNeel deed and never spoke with Houston or McNeel about the boundary line because he believed that the creek was the proper boundary line.
Burke admitted that the legal description of Houston’s property as stated in his survey did not match the legal description of the property contained in Houston’s deed. Burke testified that he did not think Houston’s property had been surveyed previously. Burke also admitted that just because he had been asked to survey a parcel of property did not indicate that the parcel was owned by the requesting party. The closing attorney, Regina Edwards, relied on the description of the property contained in Burke’s survey, rather than the description of property contained in Houston’s deed, when preparing the warranty deed by which Houston conveyed his property to Cousins in November 2004.
In May 2005, McNeel’s son, Joe McNeel III (“Joe”), learned that Cousins was claiming ownership of the disputed property; Joe informed Cousins that McNeel owned the disputed property. Cousins referred Joe to Burke, and, according to Joe, Burke indicated that he had surveyed “to the creek” as he had been requested to do. When the dispute could not be resolved, McNeel instituted this action in February 2007.
Joe testified that McNeel’s family had always recognized the fence as the eastern boundary of their property. Joe’s testimony on that' point was supported by McNeel, who testified that, beginning in 1958, she had regularly visited the property, including the disputed property; by Fletcher Majors, who had marketed timber from the McNeel property, including the disputed property, in 1986; and by Robert (Bobby) H. Shackelford, Jr., who had leased the McNeel property, including the disputed property, since the 1960s, when Stella Underwood owned it, and who had continued to lease the McNeel property after the McNeels acquired it. According to McNeel, Shackelford’s lease included all portions of the McNeel property, including the disputed property.
Joe testified that, in 2007, he noticed that timber had been cut from an area of the disputed property. He testified that, in his opinion, the cut had been recent; he based his opinion on the appearance of the stumps and the sap visible on those stumps. He also testified that, in 2008, he noticed that timber in another area of the disputed property had been cut. According to Joe, the cut area he observed in 2008 had not been cut in 2007. Based on Joe’s training and experience as a forester, his experience in the timber industry, and *852 his knowledge of what had been planted in the areas that had been cut, the trial court allowed him to testify as an expert as to the value of the timber that had been cut from the disputed property. Based on his experience and knowledge, Joe estimated that the value of the timber cut from the disputed property in 2007 and 2008 totaled between $10,000 to $15,000.
McNeel testified that, because of the boundary-line dispute, she had felt it necessary to reduce the amount she was charging Shackelford, her farming and hunting lessee, because she had asked him not to use the disputed property until the boundary-line issue was resolved. She testified that, from 2005 until the time of the trial, she had lost $1,050 in rental income as a result of the boundary-line dispute.
Thomas Edmunson, Jr., who had worked as a timber buyer for 20 years, was accepted as an expert witness by the trial court. Edmunson testified that, at Cousins’s request, he had cut timber from Cousins’s property in 2005 and again in 2007. He indicated that the plan in 2005 had been to thin the timber so that the trees would be free to grow. He disagreed that the value of the cut timber, which he referred to as “the value of the stumpage,” had been $12,000 to $15,000. He testified that he did not believe the value would be that high, but, because of the length of time that had passed, he could not place a value on the trees that had been cut.[3]
Edmunson testified that he. had been told “both times” not to cross the creek and that he had not done so. In response to an inquiry by the trial court during his direct examination by Cousins’s counsel, Edmunson testified: “[I]f the creek is not the line, that’s what we need to get established. That’s what I was told not to cross. I haven’t crossed the creek.” On cross-examination by counsel for McNeel, Edmunson testified:
“Q: Basically you’re saying you went around in this area [indicating] and cut in 2005 and then cut on the north section in 2007?
“A: Uh-huh.
“Q: Okay. Other than that, you can’t really recall anything else?
“A: I don’t think it would be no twelve thousand dollars.
“Q: On the south section?
“A: On any of it because we wasn’t clear cutting and we was just picking through it, you know. Eleven, twelve hundred dollars, something like that. It wasn’t a whole lot.
“Q: Okay. Last question. Do you think it was August 2007 that you cut?
“A: ... I feel like it was August or September.”[4]
Cousins testified that, when he became interested in purchasing his property, he first spoke with Vaughn, Houston’s realtor, and then met with Houston. Cousins testified that because Houston had been unsure of the boundary line on the east side of his property, Cousins had decided to get a survey. Cousins, however, also testified that Houston had represented to him and to two of Cousins’s employees who were also present that the creek served as the western boundary of the property.[5] Ac *853 cording to Cousins, before he purchased the property, Houston had told him that, at one time, a fence had been located in the creek but that, at some point, the creek had flooded and the fence had subsequently been moved up the hill, where it stood at that time. Cousins testified that he had been unaware that Houston’s deed indicated that Houston owned only 231 acres; according to Cousins, he had believed that Houston had conveyed 250 acres to him for the stated price of $500,000.
Cousins testified that he first learned of the boundary-line dispute in May 2005. He testified that, by that time, he had already caused timber to be cut from the disputed property and from the remaining portion of his 350-acre tract.[6] Cousins denied, however, that he had instructed Edmunson or anyone else to cut timber from the disputed property after learning of the boundary dispute. He also denied that “his timber crew” had cut timber from the disputed property in 2007. Cousins testified that he had had timber cut from the disputed property in February or March 2005 but that, in 2007, he had instructed Edmunson to cut timber from the east side of his property, not the west side where the disputed boundary line was located. Cousins testified that Edmunson was simply confused when he testified that he had cut timber from the disputed property in 2007.
Like Edmunson, Cousins disagreed with Joe’s opinion as to the value of the timber cut from the disputed property. Cousins testified that, in his opinion, the timber cut from the disputed property in 2005 had been valued at a total of $1,517.70.[7] As noted earlier, he denied that any timber had been cut from the disputed property after 2005.
Cousins also testified to the damages he claimed to have suffered as a result of Houston’s breach of the warranty deed. Cousins testified that, based on Burke’s survey and the warranty deed given to him by Houston, he had purchased 264 acres for $500,000. Thus, Cousins testified, he had paid approximately $1,893.94 per acre. Cousins testified that, if he lost the use of the 30 acres of the disputed property, he would lose their value — $56,818.18 ($1,893.94 x 30 acres) — which was part of the purchase price he had paid to Houston.
Cousins also testified that he had incurred $25,000 in defending his title to the disputed property. He testified that, had he known there was a dispute as to the boundary line separating his property *854 from the McNeel property in Township 17 North, Range 13 East, Section 4 (“section 4”) and in Township 17 North, Range 13 East, Section 9 (“section 9”), the sections in which the disputed property lies, he would not have cut timber from the disputed property in 2005.
Houston testified that he had inherited the property he sold to Cousins from his uncle in the 1970s. When asked if he had ever had a dispute with the Underwoods or the McNeels regarding the location of the boundary line, Houston indicated that he had not, that he had not known the location of the boundary line, and that he had never really cared.[8]
Houston testified that, during his ownership of the property, the taxes had doubled in one year and that he had noticed that, although his deed had indicated that his property totaled 231 acres, his tax-assessment notice had indicated that he was being assessed taxes on 250 acres. According to Houston, he unsuccessfully disputed that assessment, so he had continued to pay property taxes on 250 acres. Houston testified that, in 2002 or 2003, he had discovered that the tax assessor had improperly included in his tax assessment property that, Houston testified, should not have been included.
Houston reviewed the responses he had given to Cousins’s written discovery requests; in those responses, Houston had admitted that “there had never been any fence boundaries on the property that I was selling.” Houston testified that all he knew about the fencing on the western side of his property was that it served as a cattle fence. Houston testified that, to the best of his recollection, he had not told Cousins that the western boundary ran to the creek but that, instead, he had indicated that he was uncertain of the location of the western boundary line. Houston further testified that he believed he had conveyed to Cousins the property required to be conveyed by the purchase agreement.

Analysis

Cousins asserts multiple issues on appeal. We first address his argument that the boundary line as established in the trial court’s judgment is unsubstantiated and unsupported by evidence and that the evidence before the trial court was insufficient to allow the trial court to establish the boundary line where it did. As a result, Cousins argues, the trial court’s judgment must be reversed.
In Todd v. Owens, 592 So.2d 534, 535 (Ala.1991), our supreme court stated the standard of review applicable to this issue:
“ ‘ “[A] judgment establishing a boundary line between coterminous landowners on evidence submitted ore tenus is presumed to be correct and need only be supported by credible evidence. If so supported, the trial court’s conclusions will not be disturbed on appeal unless plainly erroneous or manifestly unjust.” Tidwell v. Stridden 457 So.2d 365, 367 (Ala.1984) (citations omitted).’
“Garringer v. Wingard, 585 So.2d 898, 899 (Ala.1991). The presumption of correctness is especially strong in boundary line dispute cases because it is difficult for the appellate court to review the evidence in such cases. Bearden v. Ellison, 560 So.2d 1042 (Ala.1990).”
*855 Cousins asserts that the trial court’s description of the location of the boundary line between the properties insofar as they lie in section 4 “is from an unknown source, is not taken from any of the deeds in either party’s chain of title, is not supported by any evidence before the court, and does not provide a proper or adequate solution to the boundary line dispute at issue.” McNeel disagrees, asserting that the property description used by the trial court to establish the boundary line in section 4 was taken from a 1979 deed in her chain of title, that that deed was before the trial court, and that the only dispute as to that portion of the boundary line that required any interpretation by the trial court was regarding the “three acres in the Southeast Corner.”
McNeel further asserts that the trial court properly applied long-standing 'case-law to create a square of the three acres in the southeast corner of section 4, as referenced in the property description contained in the judgment. See Daniels v. Williams, 177 Ala. 140,144, 58 So. 419, 421 (1912) (“A conveyance of a definite quantity of land in or off of a specified corner of a designated tract is under a well-settled rule of construction, the grant of a corner quadrangle, of equal sides, extending to that corner.”); Green v. Jordan, 83 Ala. 220, 224, 3 So. 513, 514 (1887) (“The phrase, ‘except two acres in the south-east corner,’ must be construed to mean two acres, in such corner, lying in a square, and bounded by four equal sides.”); and Wilkinson v. Roper, 74 Ala. 140,148 (1883) (stating that, when a property description called for a specified acreage off of a “side, edge or corner,” the described property must be drawn in a quadrangle of equal sides from the side, edge, or corner). See also Henderson v. Elliott, 274 Ala. 339, 341, 342, 148 So.2d 622, 623, 624 (1963) (“Complainant’s deed calls for a quadrangle containing one acre of land of equal sides in the southeast corner of the SW 1/4 of the NW 1/4 of the named section.” “As we have shown, the deed of the complainant on its face must be construed to convey one acre, in the southeast corner of the forty, lying in a square, bounded by four equal sides.”). Because the trial court relied on evidence before it and longstanding principles of property law to establish the boundary line in section 4, we conclude that Cousins has failed to demonstrate reversible error as to the description of that portion of the boundary line.
Cousins also asserts that the trial court’s description of the location of the boundary line between the properties insofar as they lie in section 9 “appears to have been taken from an old prior deed in Cousins’s chain of title ... [and] is not consistent with Cousins’s deed from Houston, his survey, or the Autauga County Tax Assessment for the last twenty years.” He also complains because the trial court’s boundary-line description gives no indication of the location of the fence in question. We find no reversible error based on those arguments.
In drafting the boundary-line description for section 9, the trial court relied on language contained in the deed by which Houston acquired his property in 1978; that deed was before the trial court. We also note that the trial court, as the trier of fact, could have concluded that Burke’s survey, Houston’s deed to Cousins, which was based on Burke’s survey, and the tax assessor’s records relating to Houston’s property contained errors in their legal descriptions.
The trial court’s description of the boundary line in section 9 also relies on section corners and an identified road, i.e., landmarks, and provides stated measurements from those landmarks to define the boundary line. Therefore, we reject Cous *856 ins’s claim that the boundary line in section 9, as established by the trial court, is deficient under Ala.Code 1975, § 35-3-3.
Additionally, although the better practice might have been to identify the location of the fence in describing the boundary line between the two parcels of property, Cousins has cited no authority, and we know of none, requiring the trial court to have done so. We further note that a trial court may, but is not required to, appoint a surveyor, pursuant to Ala. Code 1975, § 35-3-20, to assist the court in determining the location of a boundary line. See, e.g., Ex parte M.C. Dixon Family P’ship, LLLP, 993 So.2d 447, 450 (Ala.Civ.App.2006) (recognizing the trial court’s discretion as to whether to appoint a surveyor in a boundary-line dispute). As a result, we conclude that Cousins has failed to identify reversible error in the trial court’s establishment of the boundary line in section 9.
We next address Cousins’s argument that he should not be held liable for damages resulting from his cutting of timber from the disputed property. In addressing this issue, we note that, on appeal, Cousins has not challenged the trial court’s findings that the disputed property rightfully belongs to McNeel or that none of Cousins’s predecessors in title had claimed ownership to the disputed property and, therefore, that Cousins’s claim of adverse possession failed as a matter of law.
Cousins, however, has challenged the trial court’s award of damages for his cutting of the timber because, he asserts, he had a sincere belief that any timber he cut was his own and the evidence did not establish a reckless disregard for the ownership of the trees. In support of his argument, he cites Mizell v. Container Corp. of America, 486 So.2d 398, 399 (Ala.1986), in which our supreme court stated:
“The existence of a reasonable belief that the cutting is authorized or that the trees are on one’s own property constitutes a defense to [an action for statutory damages, pursuant to Ala.Code 1975, § 35-14-1 et seq.]. Vick v. Tisdale, 56 Ala.App. 565, 568, 324 So.2d 279, 282 (1975). Moreover, such a belief, even if unreasonable, will preclude liability under these statutes unless the belief is ‘so patently unreasonable as to constitute a reckless disregard for the ownership of the trees.’ Id.”
Cousins did not specifically present this theory to the trial court. During the course of the trial, he simply argued that the disputed property had been conveyed to him by Houston and that he had not cut timber from the disputed property after learning that McNeel was asserting ownership of the disputed property. Cousins, however, did not present his “reasonable belief’ defense to the trial court until the filing of his postjudgment motion. It is well settled that “a trial court has the discretion to consider a new legal argument in a post-judgment motion, but is not required to do so,” and that “[w]e will reverse only if the trial court abuses that discretion.” Green Tree Acceptance, Inc. v. Blalock, 525 So.2d 1366, 1369, 1370 (Ala.1988). Thus, the trial court was within its discretion in refusing to consider Cousins’s belated defense.
Even assuming that the trial court considered Cousins’s belated defense and rejected it, we find no reversible error. Cousins claimed that he had caused timber to be cut from the disputed property only once, in 2005, before he was notified of McNeel’s claim to the disputed property. The trial court, however, was presented with evidence indicating that Cousins had caused timber to be cut from the disputed property in 2007, after learning that McNeel was claiming to own the disputed *857 property, and again in 2008, after this litigation had been initiated. The trial court, as the trier of fact, was entitled to resolve the dispute in the evidence, and, in this case, it did so in favor of McNeel.
We also note that McNeel asserted multiple causes of action under which the trial court could have imposed damages against Cousins. McNeel asserted, among others, a claim for statutory damages, pursuant to Ala.Code 1975, § 9-13-62, which provides:
“Any person or entity who damages, destroys, cuts, or removes timber or other forest products not owned by that person or without the authority of the legal owner, ... regardless of whether the act was done knowingly or intentionally, shall be jointly and severally liable to the owner for double the fair market value of the timber or other forest products that were damaged, destroyed, cut, or removed.”
The trial court’s judgment included language sufficient to indicate that it was awarding McNeel double statutory damages, pursuant to § 9-13-62. Additionally, the trial court specifically found that Cousins had acted wantonly, which, when used in an action for trespass, “means simply an invasion of the plaintiffs’ premises with knowledge of the violation of plaintiffs’ rights.” Calvert & Marsh Coal Co. v. Pass, 393 So.2d 955, 956 (Ala.1980). See also Martin v. Glass, 84 So.3d 131 (Ala.Civ.App.2011) (plurality opinion) (affirming award of nominal and punitive damages awarded to landowner in trespass action against logger who cut several of landowner’s trees on the basis that evidence supported trial court’s finding that logger had acted wantonly; landowner had asked logger twice to leave her property and to cease cutting of timber, but logger returned and continued cutting).
On appeal, Cousins did not assert that the damages award is excessive until he filed his reply brief. In Steele v. Rosenfeld, LLC, 936 So.2d 488 (Ala.2005), the supreme court stated:
“‘The law of Alabama provides that where no legal authority is cited or argued, the effect is the same as if no argument had been made.’ Bennett v. Bennett, 506 So.2d 1021, 1023 (Ala.Civ.App.1987) (emphasis added). ‘[A]n argument may not be raised, nor may an argument be supported by citations to authority, for the first time in an appellant’s reply brief.’ Improved Benevolent & Protective Order of Elks v. Moss, 855 So.2d 1107, 1111 (Ala.Civ.App.2003), abrogated on other grounds, Ex parte Full Circle Distribution, L.L.C., 883 So.2d 638 (Ala.2003). Where an appellant first cites authority for an argument in his reply brief, it is as if the argument was first raised in that reply brief, and it will not be considered.”
936 So.2d at 493. See also Lloyd Noland Hosp. v. Durham, 906 So.2d 157, 173 (Ala.2005) (“It is a well-established principle of appellate review that we will not consider an issue not raised in an appellant’s initial brief, but raised only in the reply brief.”); and Rule 28(a)(10), Ala. R.App. P. We, therefore, find no reversible error in the trial court’s award of damages to McNeel based on Cousins’s cutting of timber from the disputed property.
Cousins next asserts that the trial court erred in denying his breach-of-the-warranty-deed claim against Houston. The deed by which Houston conveyed the property to Cousins contained the following language:
“And I do, for myself and for my heirs, executors and administrators, covenant with said GRANTEE, his heirs and assigns, that I am lawfully seized in fee simple of said premises; that he is *858 free from all encumbrances, unless otherwise stated above; that I have a good right to sell and convey the same as aforesaid; that I will and my heirs, executors and administrators shall WARRANT and DEFEND the same to the said GRANTEE, his heirs and assigns forever, against the lawful claims of all persons, except as hereinbefore provided.”
(Capitalization in original.) Thus, the deed from Houston to Cousins contained the following covenants and warranties: the covenant that Houston was seized in fee simple of the premises identified in the deed; the covenant that Houston had the right to convey the property described in the deed; the covenant of quiet enjoyment of the premises described in the deed; a covenant that there were no encumbrances against the premises described in the deed; and a covenant that Houston would warrant and defend the title to the premises described in the deed against the claims of all other persons. See, e.g., Boyce v. Cassese, 941 So.2d 932, 944 (Ala.2006) (addressing a breach-of-warranty-deed claim asserted against the seller of real property); and St. Paul Title Ins. Corp. v. Owen, 452 So.2d 482, 484 (Ala.1984) (addressing express warranty deeds and the covenants and warranties found therein); see also Jesse P. Evans III, Alabama Property Rights and Remedies § 4.4[b] (3d ed.2004) (addressing express covenants and their meaning). No exceptions to those covenants and warranties were noted in the deed.
As noted before, the deed conveying Houston’s property to Cousins incorporated the legal description from Burke’s survey, which, Burke admitted,' placed Houston’s western boundary line at the creek. To award McNeel damages on her claim of trespass, the trial court must have concluded that the disputed property, i.e., the property to the east of the creek and to the west of the fence, belongs to McNeel and that Cousins had wrongfully cut timber from the disputed property. As a result, we must conclude that the deed by which Houston conveyed his property to Cousins purported to convey property that rightfully belonged to McNeel. Thus, the evidence at trial established that, at the time Houston conveyed his property to Cousins by warranty deed, Houston was not lawfully seized in fee simple of all the property he purported to convey to Cousins. See, e.g., Boyce, 941 So.2d at 944 (in action alleging breach of a warranty deed, reversing a summary judgment entered in favor of Cassese because, at the time of the conveyance to Boyce, the property had not been free of all encumbrances, as warranted in the deed). See also Jesse P. Evans III, Alabama PropeRy Rights and Remedies § 4.4[b][I] (“The covenant of sei-sin is broken if there is an outstanding superior title, an outstanding encumbrance diminishing the value or enjoyment of the property, or if the grantor does not have substantially the very estate, both in quality and quantity, which is purportedly conveyed.”).
In his brief to this court, Houston asserts that the deed by which he conveyed the property to Cousins was a statutory warranty deed rather than a general warranty deed. He argues that a statutory warranty deed carries a lesser warranty to the grantee and that, because he was not responsible for the defect in the legal description in Cousins’s deed and because he did nothing to create McNeel’s superior claim to Cousins’s title, he cannot be liable to Cousins. It is sufficient to state that Houston’s deed to Cousins was not a statutory warranty deed because a statutory warranty deed does not contain express warranties as did the deed Houston provided to Cousins. See, e.g., Ala.Code 1975, § 35-4-271 (addressing implied warranties *859 and covenants that arise when a deed memorializing a “conveyance” contains no express warranties but contains any or all of the words “grant,” “bargain,” or “sell”).
In its May 11, 2011, judgment, the trial court found that “defendant Cousins got exactly what he bargained for in the property located east of the line established herein. Therefore there is not contribution from Houston to Cousins.” In his postjudgment motion, Cousins notified the trial court that, from the above-quoted language, it was unclear whether the -trial court had ruled on his breach-of-the-warranty-deed claim against Houston. Cousins also argued, alternatively, that, if the trial court had denied that claim, it had erred in doing so. The trial court denied that motion.
Based on the trial court’s judgment in favor of McNeel, i.e., concluding that Cousins was not the legal owner of the disputed property, which was warranted in his deed, Cousins was entitled to a judgment in his favor on his breach-of-the-warranty-deed claim against Houston. We, therefore, conclude that the trial court erred in denying Cousins’s postjudgment motion on that issue, and we reverse the trial court’s judgment to the extent it denied Cousins’s claim against Houston alleging breach of the warranty deed. We remand the cause to the trial court to determine the amount of Cousins’s damages based upon the evidence presented at the trial.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

. This is the second time Cousins and McNeel have been before us regarding this property dispute. See Cousins v. McNeel, 62 So.3d 1039 (Ala.Civ.App.2010). In Cousins, supra, we reversed a summary judgment that had been entered in favor of McNeel because, we concluded, genuine issues of material fact existed; we remanded the cause for further proceedings. Id. at 1046.

. On appeal, Cousins asserts that the disputed property totals 15 acres.

.Edmunson's testimony did not make clear whether the "value” he was referring to was regarding the timber cut in 2005, the timber cut in 2007, or both.

. Much of Edmunson's testimony was accompanied by references to "here” or “there” while pointing to a map or a plat.

. Those two employees testified at the trial; they agreed with Cousins that Houston had *853 indicated that the creek was the western boundary of his property.

. Simultaneously with his purchase of Houston's property, Cousins had purchased 30 acres located to the north of Houston’s property ("the Condra property”) and approximately 56-70 acres located to the east of Houston’s property ("the Buchanan property”). Those purchases, along with the purportedly 250-264 acres purchased from Houston, totaled approximately 350 acres. Burke’s survey had included the Condra property but not the Buchanan property.

. Cousins testified that he had received a total of $8,701.37 in 2005 for timber cut from his entire 350-acre tract, which was half open and half wooded. Cousins testified that he had calculated the per-acre price he had received from the 2005 thinning of the timber to be $50.59. He explained that he had calculated that per-acre value by dividing the amount he had received in 2005 as a result of the timber thinning ($8,701.37) by the number of woodland acres on his property (350/2 = 175) and multiplying that amount by the number of acres contained in the disputed property. Thus, he testified that he calculated the value of the "stumpage” removed from the 30-acre disputed property in the 2005 thinning as $8,701.37/175 x 30 acres = $1,517.70. Our calculation is slightly lower: $8,701.37/175 = $49.72 x 30 acres = $1,491.66.

. Houston specifically recalled, however, that, as a child, he had "sneaked” over the fence to swim in the pond or lake located on the adjacent property. According to the trial testimony, that pond or lake had once stood in the general vicinity of where the creek is located. That testimony lends support to McNeel’s and Joe’s testimony that the fence had always stood in its current location and had always served as the boundary line between the two properties.